IN THE

# SUPREME COURT OF JUDICATURE

OF THE

## STATE OF NEW JERSEY,

### NOVEMBER TERM, 1886.

---

THE CENTRAL RAILROAD COMPANY AND THE PHILA-
DELPHIA AND READING RAILROAD COMPANY ET AL.
v. THE STATE BOARD OF ASSESSORS.

1. Under the act constituting a state board of assessors to value the prop-
erty of railroads and canals, the case to be reviewed on *certiorari* by
the Supreme Court should be made by the proofs and exceptions on
the appeal before such board, and not on a rule to take testimony,
granted by the Supreme Court.

2. In estimating the value of railroad property, the cost of the acquisition
of such property is not an absolute criterion of such value, but is an
important element in the circumstances on which a judgment on the
subject is to be formed.

3. The act directs the valuation of the property of these two classes of
companies to be made in a distributive mode; that is, first, on the
main stem ; second, the other real estate used for railroad purposes ;
third, the tangible personal property ; fourth, the franchises. *Held,*
that such system of valuations has been declared by the Court of Errors
to be constitutional and unobjectionable. *Further held,* that the valua-
tions of such property, including the franchises, is legal, and as there
is no clear evidence showing the same to be exorbitant, they cannot be
modified.

4. The act, in section 6, directs that whenever in any taxing district there

VOL. XX.          1

are several branch roads belonging to or controlled by one company, the state board shall designate one of such lines as the main stem, and that the others shall be valued as property used for railroad purposes, thereby subjecting such respective parts of the property thus separated to a different rate of taxation. *Held*, that although such distribution of property with a view to variant taxation was to be justified by force of the decision in these cases by the Court of Errors, still such system was invalid inasmuch as it left it to the unguided judgment of the state board to decide which of such branches should be subjected to the higher rate of taxation.

5. Section 4 of the act directs that in case the valuations of the state board of railroad and canal property shall be relatively higher than the value of the property of other persons in any taxing district, as ascertained by the local assessors, the said board should accept, as a correct standard of value, the valuations of such local assessors ; it was shown that the local assessors illegally took but a percentage of what they deemed the true value of the property appraised by them. *Held*, that the state board could not take such reduced valuations as its standard of value.

6. Section 9 of the act provides that in case of a railroad of this state, being under lease to a foreign corporation, any tangible personal property of such foreign company, if used or kept but a part of the time in this state, shall be assessed such proportionate part of its value as the time it is used or kept in this state during the year preceding the 1st day of January designated in the act bears to the whole year ; and it appearing that certain engines and cars that were used on its leased lines in this state by the Philadelphia and Reading Railroad Company, in the course of interstate commerce, such company having in use a full local equipment of such leased lines which was duly taxed in this state—*Held*, that the tax upon such property employed in interstate commerce was illegal, being in contravention of that clause of the constitution of the United States that gives to congress the exclusive regulation of commerce between the several states.

On *certiorari* to review the assessment made by the state board of assessors. The facts appear in the opinion of the court.

Argued at June Term, 1886, before BEASLEY, CHIEF JUSTICE, and Justices MAGIE, VAN SYCKEL and KNAPP.

For the plaintiffs, *B. Williamson, Joseph D. Bedle, George R. Kaercher* and *Robert W. De Forest.*

For the state, *J. P. Stockton, Attorney-General,* and *Barker Gummere.*

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE. The two companies above named have been selected for the purposes of this opinion, as the representatives of the numerous prosecutors of the writs of *certiorari* now before the court, because in these two cases most of the important questions are presented for decision which are common to this entire class of litigants. It is to be understood, therefore, that whatever is adjudged touching such general topics, must be taken as a determination of the subject in each respective case.

The prosecutors of these writs are before the court seeking a review of certain assessments of taxes made upon their property by the state board of assessors, under the statute entitled "An act for the taxation of railroad and canal property," approved April 10th, 1884. *Pamph. L., p.* 142.

It is the sixteenth section of this enactment that imposes on this court its present duty, by giving to the company assessed, on the one side, and to the attorney-general on the other, the right to a *certiorari,* and by declaring that upon such writ relief may be had " as well in cases where it is claimed that the amount of tax is excessive or insufficient as in cases where it is claimed that the principle upon which the assessment is made is erroneous." By force of this provision the court is now appealed to, in behalf of these companies, to declare that certain parts of their assessments are erroneous, either because they are founded on exorbitant valuations of their property, which have been induced by error of judgment, or by the adoption of false principles of appraisal, or because the taxes themselves have been put upon them in disregard of the constitution of this state, or that of the United States.

Before, however, entering upon the consideration of these topics, it appears to us proper to premise that the mode adopted in bringing these procedures before the court must not be taken as an approved precedent for future action. In the present

instances the course taken has been this : the state board made its assessments, and the companies, feeling themselves aggrieved, appealed to the board for a review, as they were entitled to do by force of a provision to that effect in the statute ; from the adjudication thus resulting the proceedings were removed to this court by these writs of *certiorari*, and thereupon, in pursuance of authority given by a rule of court, testimony was taken, and it is upon that testimony that the cases have been heard and are now to be decided by us.   From this statement it is evident that as the matter stands we are trying these matters *de novo*, and are not altogether reviewing the action of the state board.   We do not think the statute justifies such a proceeding.   It does not appear to have been the legislative design to throw upon us such a burden as this, or to convert the court into a board of assessors to ascertain the values of this vast mass of multifarious property, founding its judgment on evidence taken under its authority and for the first time introduced into the case.   Our interpretation of this part of the statute is that it requires the substantial case to be laid *in extenso* before the state board, and exceptions to be there taken, and that it is the case so made, so far as it has been excepted to, that is removable to this court for review.   In our opinion no general rule to take new evidence should be allowed by this court, either on the allowance of the *certiorari* or upon its return.   This is evinced by the general adjustments of the section giving this remedy, and particularly by the fact that a *certiorari* is not permitted " unless the applicant has applied to the board to review the assessment."   The result in the present instance should serve as a warning to the court against any endeavor to try these cases anew on these appellate proceedings, as we have in our hands several volumes of arithmetical details which, to understand in their various applications, would require months of labor.   With these preliminary remarks we will proceed to dispose of the principal matters to which our attention has been called in the briefs of the several counsel.

Objection is made, in various respects, to the valuations of property which have been returned by the state board.

The first exception in this vein is that instead of ascertaining the true value of the lands of these companies, the board, after ascertaining such value, multiplied the sum thus settled by the numbers two or three, and adopted the product as the market or true value of the property. It is insisted that by this course these officers have assessed these lands at two or three times their real value.

But we have failed to see either the illegality or injustice of this part of the proceeding. The problem is not what land for agricultural or building purposes is worth, but what a narrow strip of land, with valuable easements annexed to it, adapted to railroad uses, will bring in the market. That such strip of land, to be applied in such a manner, cannot be bought at the price that the adjacent lands sell for by the acre, is at once obvious. When a railroad is located so as to pass through a building plot or a farm, the damage done to the part of the land not appropriated is generally many times the value of the land so taken, estimating its value by the acre, and consequently the owner of the required land will not sell it except at a price that will compensate him as well for the land he sells as for the damage sustained by the residue of his property. There is no reason to suppose that the land thus acquired, if sold in the market, for railroad purposes, will not bring a sum equal to the cost of its acquisition. The consequence is that even if we assume these valuations to have been made in the manner alleged by the plaintiffs, and which fact is disputed by the counsel for the state, still it is plain that the state board could not have reasonably estimated the lands in question by the measure of the value of the adjacent lands; and as there is nothing before us from which we can perceive that the result which has been attained by the methods used by the board is manifestly wrong or exorbitant, the appraisals in question cannot be annulled or reformed.

But it is again objected that the state board, in estimating the value of these roads and structures, took, as the absolute

standard of value, either the original cost of acquisition and construction, less wear and tear, or the cost of reproduction.

We think this premise is not to be conceded, for there is no evidence from which it can reasonably be inferred that so fallacious a measure of value was adopted. It is common knowledge that what a thing has cost is no infallible criterion of its market value; it is therefore to the highest degree improbable that the officers composing this board, who have manifested, so conspicuously, both capacity and knowledge with reference to the multiform and intricate subjects embraced in these suits, could have fallen into an error so utterly puerile. That the board ascertained the cost of acquisition and construction is beyond doubt; it could scarcely perform its functions intelligently without doing so, for such cost, though not an incontestable evidence of exchangeable value, is nevertheless almost always an important particular in the mass of circumstances laying the basis of a rational judgment touching the value of anything as an article of sale. That the state board used cost in the way thus indicated is clear, but it is not shown that it was used as an absolute measure. The inference drawn by counsel, that because the cost as ascertained and proved by the engineers who were the witnesses called by the state very often agrees in amount quite closely with the valuations found by the board, therefore the standard of cost was adopted by the board is, we think, not warranted. Such approximations between these respective valuations were to be expected, for no reason is perceived why the property of a successful railroad is not worth about the sum that it would cost to replace it, allowance being made for its depreciation from use.

Again, it is urged that it is not practicable to make a constitutional valuation of property for the purpose of taxation by the distributive method defined in this statute.

The statutable direction referred to is that the state board shall value separately (1) the main stem, consisting of a strip one hundred feet in width, with its superincumbent structures; (2) the other real estate used for railroad purposes; (3) the tangible personal property; (4) the franchises.

But we think that this general objection we are not called upon to consider, inasmuch as in our opinion the Court of Errors has passed upon the question, and declared this contention to be untenable. This system of disjunctive valuations lies at the basis of this act; it could not be executed on any other plan; consequently, when the act was vindicated on constitutional grounds, the system thus essential to it was likewise vindicated.

But it is further said that, admitting the constitutionality of the system just mentioned, the methods of valuation applied to the franchises of these companies are illegal and their results unjust and oppressive.

The state board has, in its return, specifically stated the mode it pursued in valuing this species of property. This is the language of the return: "And the said board do further certify and return that for the purpose of ascertaining the value of the franchise of the several corporations whose franchises were taxable under the provisions of the act above mentioned, they adopted the following rules and principles as equitable and just for the purpose, to wit: that the amount of the capital stock and of the funded and other debts of each corporation or person taxable under the act aforesaid should be ascertained, and that the value thereof should also be ascertained, and that in all cases where the aggregate amount of the value of the capital stock and of the securities representing said debts exceeded the value of the entire amount of the tangible property of such corporation, the value of the franchise should be ascertained by deducting from the aggregate amount of the value of such capital stock and of the securities representing said debts, the aggregate amount of the value of said tangible property, and that sixty per centum of the amount remaining in each case should be taken and held to be the value of the franchise of such corporation; and that in all cases where the amount of the value of the capital stock and of the securities representing said debts was less than the value of the entire amount of the tangible property of such corporation, the gross earnings of such corporation should be

ascertained, and that twenty per centum of such gross earnings (being an amount which would make the tax upon the franchise of such corporation a sum equal to one-tenth of one per centum upon such gross earnings) should be taken and held to be the value of the franchise of such corporation."

At the outset of our inquiry into this article of objection, it is well to say that we do not feel that the duty is incumbent on us to express any opinion with respect to the formula by which the board arrived at the sum which it declared to be the true value of these franchises. Our only concern is to know whether the properties, including the franchises, have been put at their true value. That there is a salable value in railroads that carry on a profitable business that is far beyond the naked value of the real and tangible property used for railroad purposes, we think is manifest, and it does no harm to any one to call such additional value, or some part of it, by the name of franchise. It seems to us unquestionable that the marketable value of a successful railroad is generally greatly in excess of the value of its road-bed, equipments and other tangible possessions. The location of the road, the places or territories it connects, its capabilities for future expansion, are all elements going to make up its productiveness as a vendible thing in the market. It would be unreasonable to affirm that a road connecting two hamlets would, under usual conditions, bring as much, if sold, as a road connecting two large cities, the cost or abstract value of the two being equal. This additional value of the road, imparted to it by reason of its location, &c., will be called, for the sake of brevity, its adventitious value.

We understand, then, that what this board has done is this, viz. : that it first ascertained the value of the road-bed, structures and tangible property, treating them as adapted to railroad uses, but without reference to the location of the particular road or its capabilities ; and in those cases in which it was found that the market value of the stock of the company indicated an excess of value beyond this appraised value of its property, after the deduction of its debts, the board proceeded

to find this factor, which obviously enhanced the value of the road as an entirety, and which had not been embraced in the estimations already made. This unvalued factor was ascertained by adding to the market value of the stock the debts of the company, and deducting from the sum so found the value of the corporate property as appraised by the board. It is plain that the subtrahend obtained by this process represents what had been above styled the adventitious value of the entire road, its chartered privileges included. It was sixty per cent. of the sum thus found that the board, calling it the value of the franchise, added to the sum of the valuations made by it, in manner already mentioned, of the real and tangible property of the company, and it was thus, by the addition of the abstract value and of the adventitious value of the road, that its entire value was found. It is quite impossible for the court to say that the result thus reached is in anywise erroneous or excessive. It is certainly not excessive if the market value of the stock of the company infallibly proved the value of its possessions after the deduction of its debts, for the board has discounted largely from its estimate obtained on that basis. We can perceive nothing in the facts before us that would justify us in interfering with valuations of this class. We do not consider that we have the right to alter or annul any of the proceedings of this body of officers, except for palpable error, for it is not to be overlooked that the statute in question expressly declares that these assessors " shall be entitled to use their personal knowledge and judgment as to the value of the property," a capacity with which this court is not endowed by the legislature.

Regarding the second method devised by the board for the ascertainment of the value of these corporate privileges, and which was applied to the class of roads that may be denominated unproductive roads, we have concluded that such method was plainly fallacious, and must accordingly be disapproved of by us. It will be perceived, from the report already quoted, that in all cases where the amount of the value of the capital stock and of the securities representing the debts was less than

the entire amount of the estimated value of the tangible property of the corporation, the board ascertained the amount of the gross earnings of the company, and took twenty per cent. of such earnings as the value of the franchise. But we have been utterly unable to find, under the conditions stated, any value to such franchises other than the expense of their acquisition under the general railroad law of the state. The property of these companies was estimated on the basis of its being railroad property, that is, that it was adapted to such uses and would be so applied. In these instances, unlike the class just disposed of, the market value of the stock does not indicate the presence of any other factor adding a value in the entire road in excess of the estimation thus made. Under these circumstances it is not certain that a purchaser of the road would give for it anything more than the value of the real and personal property and the cost of acquiring the franchise in the statutory mode; for in these cases the road has no adventitious value, at least none such is apparent in the price of the stock.

Our conclusion, consequently, on this branch of the case is that the valuations of the franchises made in this latter method and on the basis of gross earnings, must be discarded, and in lieu thereof a merely nominal sum must be substituted.

The solution of the next question has been a work of some difficulty.

In the sixth section of the act we are considering will be found a provision in the following words, viz.: " That whenever in any taxing district there shall be several branch lines of railroad belonging to or controlled by one company, or operated under one management, the assessors shall designate one of such lines as the main stem, and the value of the others shall be included in the separate valuation provided for in the second subdivision of section 3 of this bill."

It will be found, upon consulting section 3 of the act thus referred to, that the property to be assessed by its force is required to be assessed at a higher rate than that put upon the main stem, so that in point of fact, in the execution of this

law, wherever more than two branch roads have been found in any taxing district, one has been denominated main stem by the board, and has consequently been assessed at a lower rate than the rest of such branches.

From this presentation of this statutory provision, as applied to the facts, it will be observed that here are railroad branches, identical in all essential characteristics, and applied to an identical use, separated for the purpose of taxation and assessed under a multiform rule, the result being that such properties, by an arbitrary legislative fiat, are unequally burdened. It appears from the proofs before us that in several instances where there were three branch roads in one taxing district, being under one management though owned by different companies, one of them has been denominated as a main stem by the state board, in compliance with the act, and has thus been assessed at a lighter rate than the other two. This selection of a main stem is made at the will of this official body, uncontrolled by any legislative standard, and unguided by any peculiarity in the individuals of the class to be selected from, for they are in all respects alike.

If the problem thus presented were to be solved by reasoning *a priori*, I should have no hesitation in declaring such an assessment to be illegal. But such is not the present posture of this question. When these cases, in their general phases, were before this court, the clause of the constitution of the state that prescribes " that property shall be assessed under general laws and by uniform rules " was expounded to require the inclusion in the assemblage of things to be taxed of everything possessed of a like nature and of like characteristics, and that the things so brought into association should be subjected to an equable burden. By force of the requirement that the assessment should be made under " general laws," it was deemed that when a tax was sought to be imposed upon things possessed of a certain nature and characteristics, all the things corresponding in these particulars must be embraced in the act; that a part of such things could not be taxed and a part exempted. And it was further thought that the second

requirement that these assessments were to be made by "uniform rules" guaranteed that all the things thus classified would be taxed at the same rate; that the things classed would not be subdivided into groups, as it was conceived was done under the present law, and such groups unequally burdened. The view entertained was that before the introduction of this constitutional regulation it was not entirely certain whether things might not be grouped instead of being classified, for the purpose of taxing them, and it was equally uncertain whether, having been properly classified, the class so formed could not be broken into parts, to the end that they might be taxed at different rates. These two regulations thus construed were not only consistent, but the latter was the essential complement of the former; it was thought to be far from difficult to give to either of them a meaning that would dispense with the necessity of the existence of the other, but by accepting both in the sense indicated they harmonized in effecting the highly desirable result that all similar property should be similarly taxed. Testing the act now under advisement by this theory, it was pronounced by this court to be in contravention of the constitution, inasmuch as it grouped the property, real and personal, which was owned or used in their business by railroad and canal companies, and taxed it, at the same time that all similar property owned by other persons was left untaxed. This view was not concurred in by the Court of Errors on review; the law separating the possessions of these two descriptions of corporations from all other property, and separately and exclusively taxing them, was declared to be a constitutional exercise of legislative authority; and the point of inquiry consequently is to determine the principle upon which that decision rests in order to apply it to the novel phases of this case that we are called upon to decide.

It will be observed that the first question is whether the legislature could cause these branch railroads to be separated into groups, and direct variant rates of tax to be placed on such groups. As such roads, considered intrinsically and with respect to their uses, are not to be discriminated, such a dis-

tribution, it is plain, can be justified only on the assumption that it is lawful for the legislature to select for taxation what property it pleases out of a mass of property identical both as to essence and application. The inquiry, therefore, is, has the Court of Errors laid down, as the basis of its decision, a principle that recognizes the existence of such an untrammeled power?

After a careful examination of the subject I have come to the conclusion that this question must be answered in the affirmative. It seems to me indubitable that it has been established in this state that property of any kind can be grouped for taxation arbitrarily by the legislature.

As has already appeared, that this court had decided that the legislature, in the course of taxing property, could not take part of a class and tax exclusively such part, and that the properties of railroad and canal companies, standing by themselves, were a group, and not a class, but the superior court held the contrary of this, declaring that such an assemblage of properties constituted a true class on which distinct taxes could be lawfully imposed. The ground of this conclusion was not that the things thus selected were, in their essential characteristics, alike, and that they were unlike other things belonging to other persons. Inasmuch as the land in the use of a railroad company did not in any important respect, differ from other land—inasmuch as a boat employed by a canal company did not, in any material feature, vary from other boats, it was obvious that such things could not be set apart from other lands and other boats by reason of their intrinsical dissimilitude. It was impossible for the court to declare that the real and tangible personal property of a railroad was like the real and tangible personal property of a canal, and was unlike all other property, and on account of such likeness *inter se*, and such dissimilarity to other objects, could be placed in a group by themselves and separately taxed. It was self-evident that railroad property was unlike canal property, and no attempt was therefore made to assimilate them with a view to a classification, but they were applied to the same common use, and

it was by this link they were accordingly bound together for the purpose of taxation. The fact that these properties were put to the same use was the basis laid by the Court of Errors of its classification. In his opinion, the learned Chancellor upon this subject expresses his views in these words, viz. : " In the act under consideration the legislature has separated for taxation, not all the property of railroad and canal companies, but only so much of it as is used for the particular purposes of those corporations, and has imposed upon the property so separated a tax for state purposes and tax for county and municipal purposes. The property of such companies not used for special purposes is left to be taxed in the same manner as other like property. The property separated, so far from being taken by mere arbitrary selection, is all of it so circumstanced by the peculiar use to which it is put as to make it, on that account, a class by itself." *State Board of Assessors* v. *Central R. R. Co.*, 19 *Vroom* 278. And Mr. Justice Dixon, with characteristic clearness, thus formulates the same principle of classification. He says : " The property to be assessed is all property used for railroad purposes and all property used for canal purposes. This is, in my judgment, a legitimate classification. It is true that things used for railroad and canal purposes are not in essence different from such things when put to other uses. But the classification of property need not rest on the essence of things. The *use* made of them forms as just and as common a basis of classification as does their essence." 19 *Vroom* 313.

From these extracts the *ratio decidendi* is clearly apparent, and from the foundation thus laid it seems inevitably to follow that when the statute was vindicated the power of the legislature to take at will part of a class of property, the whole class being devoted to the same use, and to tax such part exclusively, was likewise vindicated. For when it was declared that these two kinds of unlike properties, on account of their common use, would constitute a class to be separately taxed, it cannot be assumed that the fact was overlooked that such property was only a part of that devoted to such use. The

properties of railroads and canals are commercial instrumentalities, the common use to which they are put being the transportation of persons and merchandise from place to place. But such properties are merely a part of the property devoted to such use. The properties of these two classes of corporations do not differ in the least degree, in this respect, from the properties of all other common carriers. No one can say that railroad property can be discriminated by its use from that of an express company or a ferry company, or from that of any other person, natural or artificial, whose business it is to carry for hire articles of traffic from one place to another. A canal, with respect to its employment as property, is undistinguishable from a turnpike; they each furnish a way for the transit of persons and property on the payment of tolls, the only material difference between such ways being that the one is constituted of water and the other of earth. The property of a city horse car company is employed in carrying persons from place to place as a common carrier, and it seems quite impossible to make a discrimination, in respect to the use of its property, between it and a railroad company, and it seems equally impossible to affirm that it is not more like, in all matters of use or conformation, to a railroad company, than a canal company is. In view, then, of the fact that this act that thus groups for taxation the properties of railroads and canals, that have no resemblance to each other except from the circumstance that they are similarly used as instruments of commercial transportation, and that such act does not embrace the properties of turnpike, city horse car railroads, or those of other common carriers, which are all alike used as instruments of commercial transportation, has been approved by the Court of Errors, there appears to be no other conclusion to be drawn than that the right of the legislature to set aside any groups of property for special taxation, has received the sanction of that tribunal.

So we are necessarily led to the same conclusion when we turn our attention to another feature of this statute, and which has likewise received the approval of the court of last resort.

I refer to that part of the act which directs that the main stem of each railroad, and the water-way of each canal, of the width of one hundred feet, shall be separated from all the other property of such companies used in their business, and that the property contained in such separated area, together with the included structures, shall be taxed at a lesser rate than the land thus placed outside of such area. It will be observed, therefore, that if one of these companies happens to own more property, used in its business, which stands outside of such main stem, than is possessed by another company, the former is burthened by a higher tax than the latter is, although the properties thus differentiated by the amounts of their respective taxes are identical, both in kind and with respect to use, and although the quantity of land owned by such respective companies is the same and may be precisely of the same value. Let us suppose, for the sake of perspicuity, one company to own, in a certain taxing district, one hundred acres of land, the whole of such tract, with the structures upon it, being within the area denominated main stem, and being of the value, say, of $100,000, and another company to own a similar tract, with structures similar in all respects and of similar value, one-half of which is outside of such main stem, the result will be that this extraneous half will be taxed at a heavier rate than any part of those of the first-mentioned company will be taxed at; the things are the same, the value is the same and the use is the same, but the taxes are unequal. The direction of the act was to tear asunder objects which are inseparable both from their nature and use, and that a dissimilar tax should be put upon such disjointed fragments. We have not been told upon what basis such a grouping was to be rested; all that we know is that the court of last resort has announced that such a scheme of taxation is constitutional, and that this was a taxing "under general laws and by a uniform rule." I can entertain no doubt that the legislative act thus done was an arbitrary grouping of this property for the purpose of taxation, and that as such act having been approved of

by the highest court in the state, the legislative power, to the extent herein exhibited, has been established.

Consequently, accrediting to the legislative department of the government the prerogative just stated, no reason is perceived why the law-makers were not competent to separate these branch roads, already indicated, into groups, with a view to taxing them at different rates.  Such an act is plainly mere arbitrary selection, but not more so than selecting the properties or railroads and canals, on the basis of their use, out of all other property employed in such use.  The consequence is that had the legislature itself declared that where there were several branch roads in one taxing district a particular one of such roads should be treated as the main stem and taxed accordingly, and that the others should be taken as branches, and, as such, taxed at a greater rate, I could not have judicially pronounced, whatever my private views may be, such an exertion of power illegitimate, because the existence of such a power has been recognized, as I deem it clear, by the court of last resort.  But the present problem does not stand before us thus simply conditioned; the legislature has not itself declared which of these branches is to be selected as main stem, but has delegated the power to make such selection to the state board.  In other words, this body of officers is authorized to say which branch, out of three or more, shall be chosen as main stem, and shall thereby be exempted from a part of the tax to which the rest will be liable.  The legislature has not provided any standard by which the selection in question is to be made ; everything in this matter being left to the unguided discretion of the designated officials.  It has been held in this court on several occasions that in the exercising of the taxing power both the amount of the tax and the subjects to be subjected to it must be fixed by the legislature itself, or some standard must be provided by it whereby such matters may be plainly ascertained.  Neither of such things can be left at large, to be decided by the judgment of any set of officers.  Such we understand to have been the view heretofore taken of this subject. But as the matter now stands we do not feel that it is entirely

free from difficulty. It has been decided, in an authoritative form, as has already been shown, that methods of taxation are constitutional which, it must be owned, indicate the possession by the legislature of a power over the subject the bounds of which cannot, at present, be defined with precision. It is certainly to be regretted that when the court of last resort dealt with this statute it did not proceed to declare what power, if any, resides in the constitutional clause then in discussion before it. The subject was a most momentous one, especially at the present time, for it embraces the inquiry whether or not property in this state, in the hands of private owners, has any protection whatever, by virtue of the fundamental law, against aggressive taxation. But inasmuch as the judgment of the Court of Errors did not, in express terms, declare that the particular provision relative to the assessments of these branch roads was, in all respects, legal, we deem ourselves at liberty to decide the problem according to our own convictions with respect to the law of the subject. We therefore say, that in our opinion, this part of the act cannot be executed in the particular manner provided, and that such section being void, these branch roads must be taxed according to the general mode defined in this law—that is, each branch road must be assessed in part as main stem and in part as property used for railroad purposes.

In the next place, it is objected that the real estate of these companies used for railroad purposes, other than main stem, has not been valued by the state board in accordance with the statutory direction.

We find the provision on this subject expressed in the terms following, viz.:

Section 4. That if the assessed value of the real estate of persons, other than railroad or canal corporations, in any taxing district wherein such railroad or canal property may be found, as ascertained by the assessors of such taxing district, is relatively lower than that which has been laid upon the land of the several companies in said taxing district, the said board shall be required to accept said valuation of the assessors for

such taxing district as a correct standard of value, and to thereby correct or reduce the separate valuation provided for in the second subdivision of section 3 of this bill.

The complaint is that in executing this provision the state board refused to take the standard of valuation thus provided.

The facts forming the basis of this position are these: the board reported that " the main stem and personal property of all railroads have been valued in accordance with the provision of the law at their full or true value, while the universal custom of local assessors is to value for taxation at a percentage of true value, ranging all the way from forty to eighty per cent., averaging, it is thought, about sixty-five per cent. of true value."

It appears, therefore, that the board has taken true value as the standard, and has refused to discount anything from such estimation on account of the custom of the local assessors in that respect.    It is now insisted that the standard erected by the legislature for the use of the state board was true value *minus* this percentage of deduction.

But if this be the proper interpretion of the section, the plain result is that the whole provision is absolutely void. It was not competent for the legislature to put in force such a procedure.    The constitution says, in express terms, that property shall be assessed for taxation at " its true value," and if the legislature has authorized it to be assessed otherwise such direction is nugatory, and the act must necessarily be enforced without reference to it.

But it is not clear that this was the legislative design; for, looking at the entire section in question, it is conceived it may be understood as providing for cases in which the judgments of the state board and the local assessors are in disagreement touching the true value of the property in the several localities, and when the true value found by such local officers is less than the true value as found by the board, the estimate of the former shall be the standard.    When, therefore, it appears that the local officers find a given sum as value for the purposes of taxation, and at the same time state that such sum

does not represent true value by a certain percentage that has been discounted, the valuation of the assessors which the board is required to apply as the "correct standard of value," is the sum that such local officers have found to be the true value—that is, the value put by them upon the property without the deduction of any percentage. The true value which the assessors, in point of fact, find, is one thing, and the value which they adopt is quite another, and it is the former that is required to be received as a measure by the board ; but as there is nothing in the proofs from which we can draw the conclusion that such measure does not in substance coincide with the valuations which have been made of this property, this objection cannot prevail.

The last exception which will be disposed of at this time relates to the mode provided in section 9 of the act for the taxation of railroad property put in use in this state by foreign corporations.

The section referred to is in these words, viz.: "That if the property of any railroad or canal company be leased or operated by any other corporation, foreign or domestic, the property of the lessor or company whose property is operated shall be subject to taxation in the manner hereinbefore directed, and if the lessee or operating company, being a foreign corporation, be the owner or possessor of any property in this state other than that which it derives from the lessor or company whose property is operated, it shall be assessed, in respect of such property, in like manner as any domestic railroad or canal company ; any tangible personal property of such foreign company, if used or kept but a part of the time in this state, shall be assessed such proportionate part of its value as the time it is used or kept in this state during the year preceding the 1st day of January, mentioned in section 21 hereof, bears to the whole year."

Certain property of the Philadelphia and Reading Railroad Company, consisting of engines, cars, &c., which it has not derived, as lessee or otherwise, from any company whose property is operated by it in this state, has been taxed by the state

board under the provisions of the section thus recited. The Philadelphia and Reading company is taxed in this manner because it is a foreign corporation, operating a railroad in this state as a lessee. This corporation was incorporated under the laws of Pennsylvania, and has its principal office and place of business in the city of Philadelphia. The property taxed is held by it either as general or special owner. It is taxed on the basis of being used part of the time, on the roads leased by the company in this state, and the tax is graduated by the length, in point of time, of such use. It appears from the proofs that such use consists almost entirely in the transportation of passengers and merchandise across the territory of this state in the course of interstate commerce. The road is made up, in part, of leased roads in other states and in this state, and the equipments taxed are devoted to this business over the entire line. The company carries passengers and goods occasionally from place to place in this state by means of these trains, and as an incident merely to its business of assisting in the commerce between the states.

The question, therefore, arises, What jurisdiction has this state, for the purposes of taxation, over this property?

It is obvious that these things have no *situs* in this state; they are merely here *in transitu.* The circumstance that they pass over a road in this state leased by the owner of them cannot so annex them to the road as to make them taxable as a part of it. The owner of the property has a foreign domicile, which is the permanent *situs* of the property, it being brought into this jurisdiction solely in consequence of the general business followed by the corporation and which has been already characterized.

It will also be noted that this is not a tax on the business of this company, falling incidentally and in the distance on the property in question, but it is imposed with absolute directness upon these vehicles of interstate commerce. This is so plainly the case that the tax increases in proportion to the increase in the use of such vehicles in this state, and diminishes as such is diminished. The case is therefore entirely aside

of that class of decisions cited in the briefs of counsel, which hold that under certain conditions a tax may be laid on the business of persons, although such tax may ultimately rest, in some degree, on the business of interstate commerce.

The leading case in this state on the subject to be disposed of is that of the *Erie Railway Company* v. *State*, 2 *Vroom* 531, in which it was declared in the court of last resort that a tax could not be laid on the business of foreign corporations, such business consisting in the transportation of persons and things from state to state, for the reason that it was an infringement of the clause of the constitution of the United States which gave to congress the regulation of commerce between the several states. In that instance the tax was, in form, on the business of the company, but the court, looking beyond the form, considered that it was in substance on the persons and things carried, and was therefore illegitimate. In the case now before us the tax, as has been shown, is directly on the instruments essential to the commercial intercourse between the states, so that the present case appears to be plainly subject to the principle established in the decision referred to.

This subject has also received much consideration, particularly of late, in the Supreme and Circuit Courts of the United States. A conspicuous example in this train of decisions is that of *Hays* v. *Pacific Mail Steamship Co*, 17 *How*. 596. That company was a corporation of New York, being the owner of vessels, registered there, which plied between New York city and San Francisco, and different ports in Oregon. Its principal office was in New York, but it had agencies established in Panama and in San Francisco, having also a naval dock and shipyard at Benicia, in California, for the purpose of furnishing and repairing its steamers, which usually remained only long enough at San Francisco to land and receive passengers and cargo, and at Benicia only for repairs and supplies. Taxes had been assessed upon these steamers in the State of California, and such was declared by the Supreme Court of the United States to be illegal, the grounds of judgment being assigned in the opinion in these words, viz.: " We

are satisfied that the State of California had no jurisdiction over these vessels for the purpose of taxation; they are not property abiding within its limits, so as to become incorporated with the other personal property of the state; they were there but temporarily engaged in lawful trade and commerce, with their *situs* at the home port where the vessels belonged, and where their owners were liable to be taxed for the capital invested, and where the taxes had been paid."

The same doctrine was embodied in the decision of the similar case of the *Gloucester Ferry Company* v. *Pennsylvania*, 114 *U. S.* 197. That company was a corporation of this state, and ran its boats from this state to a dock in the city of Philadelphia, of which dock it was the lessee. The boats were registered in this state. Taxes were laid on the company in Pennsylvania, on the appraised value of its capital stock, which was adjudged to be illegal by the Court of Common Pleas of the city of Philadelphia, for the reason that there was no other business carried on in the State of Pennsylvania, except the landing and receiving of passengers and freight, and which was a part of the commerce of the country, and which was, consequently, protected from the imposition of burthens by the state legislature. This judgment was affirmed, on the same grounds, by the Supreme Court of the United States.

We think the aptness of these decisions, as authorities in our present inquiry, is clear. These vessels were exempted from taxation by the states whose territories they merely touched in passing, as they were the means of commercial intercommunication between the states. Nor do we deem that it would in anywise have affected the judgments in these cases if it had appeared that these vessels, in passing, had carried passengers or goods from one port to another in the state imposing the tax, as the vessels were obviously not within the jurisdiction of the state for the purpose of prosecuting a local trade, such local transportation being but an incident to the general business in which they were employed.

The case which is, perhaps, more nearly in point for present

uses, at least with regard to its circumstances, is that of the *Pullman Southern Car Co.* v. *Nolan*, 22 *Fed. Rep.* 5. The State of Tennessee had assessed upon that company a privilege tax of $75 per annum, for running or using sleeping-cars in the transportation of interstate passengers. Mr. Justice Matthews, sitting in the United States Circuit Court, pronounced such imposition to be unconstitutional, on the ground that the property taxed had no abiding place in the state, and, being engaged in commerce between the states, was within the jurisdiction of Tennessee only *in transitu.*

The judgments rendered by this court in the cases of *State* v. *Engle*, 5 *Vroom* 425, and *State* v. *Carrigan*, 10 *Vroom* 35, are authorities of similar import.

It will be observed that the only distinction which can be alleged to exist between the substantial facts of the cases cited and the present one is the circumstance that the Reading company is the lessee of these roads, over which it passes its trains in crossing this state. But, as we have already said, we cannot perceive that such peculiarity can at all affect the rule by which the case is to be governed, inasmuch as the property in question is not brought into the state as the local equipment of these roads, but comes here necessarily, in the course of the general business of the company, that business being the transportation of persons and property from state to state. If these engines and cars were, in substance and effect, the local appliances of these leased roads, they would then have a *situs* in this state, and could be taxed accordingly; but such is plainly not the case, for the local equipments of their lines belong to the lessors, and, though passing to the Reading company under the lease, have been properly taxed, by virtue of the statute, to such lessors. The proofs before us clearly demonstrate that in no proper sense can the property in question be regarded as the equipments of the roads used by this company in this state. We look upon that property, and which is owned by a non-resident, as being here in this state solely because it is an instrumentality of interstate commerce, and we think, under such conditions, that it cannot be, to any

degree, directly taxed by this state. Railroads have already become the great highways of the nation, and we think it of the first importance that the traffic connected with them should be as free as the air, so far as local exactions are concerned.

This item of the tax must be deducted from the assessment.

But, from the foregoing view it is not to be understood that it is decided that a foreign railroad company, being possessed of no local equipment for a leased road lying in this territory, or having but an insufficient equipment, can, by means of its through trains, do a local business therein, and then claim entire exemption from taxation in this jurisdiction, on the ground that such trains were employed in the interstate commerce? We think that in such cases the property is devoted to two uses, that is, in local as well as interstate commerce, and that, at least to the extent that it is employed in the former business, it is taxable by the state. Whenever, therefore, a foreign railroad company is using a leased line in this state, and has no adequate local equipment for such line, and does a substantial local business here, by many of its trains *in transitu,* the property so used should be at least measurably taxed as being possessed of a *situs* in this state, and not to that extent being under the protection of the federal constitution. But when, as in the case of the Philadelphia and Reading Railroad Company, there is a reasonable local equipment used for local business, and the through trains of the company, in the prosecution, evidently, of its business of commerce between the states, and, as an incident to such business, takes up passengers or goods and transports them from one place to another place in the state, we think the property so employed is not subjected to the taxing power of this state.