**CENTRAL R. CO. OF NEW JERSEY v. MARTIN, State Tax Com'r, et al., and nine other cases.**

| 1934 No. | 1935 No. | 1936 No. |
|---|---|---|
| 5184 | | |
| —— | 5490 | 5693 |
| 5199 | 5494 | 5691 |
| 5200 | —— | —— |
| 5201 | 5491 | 5688 |
| 5202 | 5493 | 5689 |
| 5203 | 5496 | 5694 |
| 5204 | 5495 | 5692 |
| 5205 | 5492 | 5687 |
| 5206 | 5497 | 5690 |

District Court, D. New Jersey.
Nov. 1, 1939.

Maximilian M. Stallman, of Newark, N. J., and Robert J. Bain, of Jersey City, N. J. (Jacob Aronson, Richard W. Barrett, Herbert A. Taylor, Alexander H. Elder, and John L. Seager, all of New York City, of counsel), for plaintiffs.

David T. Wilentz, Atty. Gen. of New Jersey (Duane E. Minard and Charles V. Webb, Jr., both of Newark, N. J., of counsel), for defendants.

*Historical Background*

FORMAN, District Judge.

This litigation is a sequel to that brought by some of the present plaintiff companies involving taxes for the year 1932, the disposition of which, by this court, is reported in Lehigh Valley Railroad Co. of New Jersey et al. v. Martin, Tax Commissioner of State of New Jersey et al., etc., 19 F.Supp. 63 et seq., and involving taxes for the year 1933, as reported in Central Railroad Co. of New Jersey v. Martin, Tax Commissioner of New Jersey et al., and six other cases, D.C., 19 F.Supp. 82 et seq., affirmed, Lehigh Valley Railroad Co. v. Martin, Tax Commissioner, 3 Cir., 100 F.2d 139; certiorari denied, 306 U.S. 651, 59 S.Ct. 592, 83 L.Ed. 1049.

The railroad companies had appealed each of the assessments here in suit to the State Board of Tax Appeals which in each case denied the contentions of the plaintiffs.

Over opposition preliminary injunctions were granted in this court restraining the authorities from collecting above sixty per cent of the taxes for the years 1934 and 1935 as reported in Central Railroad Co. of New Jersey v. Martin, D.C., 19 F.Supp. 84. Similar restraining orders were entered to cover the year 1936.

Answers were filed by the defendants and on final hearing all of the cases were consolidated for trial, upon which a huge volume of testimony was offered.

The pertinent provisions of the Railroad Tax Act are as follows:

"The state tax commissioner shall sit at Trenton on the first Tuesday of March in each year, and as often during the year and at such places as his duties may require for the purpose of ascertaining the true value, as of the first day of January preceding, of all property used for railroad or canal purposes of each railroad and of each canal company in this state, including its franchises, and he shall, in such ascertainment, ascertain:

"I. The length and value of the main stem of each railroad, and of the waterway of each canal and the length of such main-stem and waterway in each taxing district;

"II. The value of the other real estate used for railroad or canal purposes in each taxing district in this state, including the roadbed (other than main stem), waterways, reservoirs, tracks, buildings, water tanks, waterworks, riparian rights, docks, wharves and piers, and all other real estate, except lands not used for railroad or canal purposes;

"III. The value of all the tangible personal property of each railroad and of each canal company;

"IV. The value of the remaining property, including the franchise." Revised Statutes of New Jersey 1937, 54:22-1, N.J.S.A. 54:22-1.

For the purpose of valuing these properties for taxation the tax department maintains a separate inventory of all lands and structures of each subsidiary or owning company. These lands and structures are artificially classified and listed as first class or second class. In the first class are included all the lands and structures except depots and stations within the "main stem", which is defined as a strip of land not exceeding 100 feet in width. The second class includes all lands and structures appurtenant to the railroad outside of the 100 foot strip, but includes also the freight and passenger stations located within such strip. The inventories in use were made in 1911, and have been kept up to date by annual reports showing the addition of new and the retirement of listed facilities. There are also lists or records showing the locomotives, cars and special equipment of each railroad, and the number or percentages thereof used or present in New Jersey on certain selected test days as well as lists or records of ferry boats, tug boats, car floats, barges, etc., used in ferrying freight and passengers between New Jersey and New York.

The State Tax Commissioner each year makes a "primary" valuation which is submitted to each railroad company for examination and criticism, and later he grants a hearing on any protests which may be filed against the proposed valuation. As a result, the valuation of one or more individual items may be changed, which will affect the total of the valuation, but the grand total of the assessment figures is not open to question or modification *as such*. After the state tax commissioner decides on his final valuations the taxes are computed thereon. From such valuation there is an appeal to the State Board of Tax Appeals, which has power to modify or correct the assessments. Power further to review, modify or correct the assessments under a writ of certiorari is conferred upon the State Supreme Court.

Chronologically, if we take, for example, the taxes assessed for the calendar year beginning January 1, 1934, the railroads are required to report conditions as of that time to the State Tax Commissioner before March 1, 1934. These returns may be considered until November 1, 1934 when the result of the investigation and a report of the valuation is made to the railroads. The valuations are completed by the State Tax Commissioner before December 10, 1934, and they are subject to his review on the second Monday in January of 1935. Meanwhile, the average tax rate is struck from reports submitted by the local taxing districts to the State Tax Commissioner so that it may be applied to the valuations. Application may be made to the State Board of Tax Appeals to review the valuations on the third Monday of June 1935, and the taxes are due and payable on

December 1, 1935. Thus, it is seen that a lapse of nearly two years occurs from the beginning of the taxable year to the date when the taxes for that year become due and payable.

*Plaintiffs' Contentions*

Plaintiffs complain that the practice of the State Tax Department in valuing these properties for taxation results in illegal and excessive valuation. Their complaints are generally as follows:

All the lands are individually valued according to the ascertained market value of adjacent lands not used for railroad purposes.

Structures are individually valued according to the local cost of reproduction less depreciation.

The equipment, or that portion of it allocated or assigned to the State of New Jersey, is also valued according to cost less depreciation.

The franchise valuation is an estimate based on no definite figures.

Plaintiffs complain that the earnings of the railroads are not reflected in the valuations that the taxes are not computed upon true valuations of the property as required by the State Constitution and Laws, that they are excessive, discriminatory and violative of the due process and equal protection clauses of the Constitution and that the assessments impose an undue burden upon interstate commerce.

Plaintiffs further complain that in so far as the instant assessments are concerned, no attempt has been made to value a railroad as such, or to value any of the New Jersey divisions as parts of the systems to which they belong, or to ascertain the values with reference to the earnings of the systems or with relation to the value of the stocks and bonds.

*Defendants' Contentions*

The defendants contend in these suits as heretofore that this court is without jurisdiction to dispose of the controversy. The reasons therefor are substantially the same as those urged upon the court in the 1932–33 and '34 cases; namely, that a three judge court should have been convoked for its determination that an injunction if granted would be violative of Section 265 of the Judicial Code, 28 U.S.C.A. § 379, that no irreparable injury has been demonstrated, that the plaintiffs have an adequate remedy at law, that the prior decisions of this court and of the New Jersey State Court are res adjudicata and a bar to these proceedings, and finally, that the suit is against the State of New Jersey, which is prohibited by the Eleventh Amendment, U.S.C.A.Const.

We are not inclined to reconsider these jurisdictional problems in the absence of additional grounds for their application. The only new matters advanced by the defendants are founded upon the recent decision of the Supreme Court of the United States, Worcester County Trust Company v. Riley, 302 U.S. 292, 58 S.Ct. 185, 82 L.Ed. 268, and the decision of the Third Circuit Court of Appeals disposing of the appeal from this court of tax cases involving the years 1932 and 1933, Lehigh Valley R. Co. of New Jersey v. Martin, 100 F.2d 139. Worcester County Trust Co. v. Riley, supra, sustains the view that a suit against a state will not be justified unless there is a violation of constitutional rights. The Court was unable to find such an invasion and condemned the proceedings as being an infringement of the Eleventh Amendment of the Constitution, U.S.C.A. This case is not dispositive of the instant case unless there is no constitutional infringement involved herein.

The Third Circuit Court of Appeals in the cases of Lehigh Valley Railroad Company et al. v. Martin, supra, made specific observations relative to the defense of res adjudicata. Those cases originated in this court (19 F.Supp. 63; Central R. Co. v. Martin, 19 F.Supp. 82) and as hereinbefore indicated involved assessments for the calendar years 1932 and 1933. The 1933 case was previously reviewed by the Supreme Court of New Jersey upon certiorari to the State Board of Tax Appeals, Central Railroad Co. v. Thayer-Martin, 114 N.J.L. 69, 175 A. 637, and then suits involving that same year together with cases involving the 1932 assessments were instituted in this court. The 1932 assessments had advanced in the state tribunals only as far as the State Board of Tax Appeals. The parties stipulated that the 1932 cases should be determined on the record which was made at the hearing before the State Board of Tax Appeals, and reviewed by the Supreme Court of New Jersey in the cases concerning assessments for the year 1933. *Thus, it was agreed that the law and facts governing both years were the same.* This court determined the 1932 controversy upon its merits, but for procedural reasons dismissed the controversy

in so far as the 1933 assessments were concerned. On Appeal the court stated:

"The appellees also assert that every question presented by the nine appeals is res adjudicata by reason of the decision of the Supreme Court reported as Central R. R. Co. v. Thayer-Martin, supra. There is in fact an identity of parties, issues and subject matter presented by the suits at bar and Central R. R. Co. v. Thayer-Martin, supra. The records in these cases are identical in all pertinent respects. Examination of the reported decision in Central R. R. Co. v. Thayer-Martin, shows that questions concerning both the method of assessment and alleged discrimination in making the assessments were raised and adjudicated by the Supreme Court of New Jersey. While it is true that the provisions of the Fourteenth Amendment and the Commerce Clause [U.S.C.A.Const.] were not specifically adverted to, none the less all constitutional questions raised in the court below could have been raised and rights thereunder asserted in the proceedings in the Supreme Court of New Jersey. Therefore, whether asserted or not, such questions are res adjudicata now. Fidelity National Bank v. Swope, 274 U.S. 123, 130, 131, 47 S.Ct. 511, 71 L.Ed. 959; American Surety Co. v. Baldwin, 287 U.S. 156, 167, 53 S.Ct. 98, 77 L.Ed. 231, 86 A.L.R. 298; Grubb v. Public Utilities Commission, 281 U.S. 470, 479, 50 S.Ct. 374, 74 L.Ed. 972. It is also settled that in tax cases the doctrine of res adjudicata concludes parties to a subsequent proceeding upon all questions determined by an earlier decision. Tait v. Western Maryland Railroad Co., 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1405; Nachod Co. v. Helvering, 6 Cir., 74 F.2d 164; Henderson v. United States Radiator Corporation, 10 Cir., 78 F.2d 674.

"There can be no question but that the courts of a state are competent to hear and determine questions arising under the Constitution and laws of the United States, Detroit, etc., R. Co. v. Michigan Railroad Commission, 235 U.S. 402, 35 S.Ct. 126, 59 L.Ed. 288; State Corporation Commission v. Wichita Gas Co., 290 U.S. 561, 54 S.Ct. 321, 78 L.Ed. 500; Dorrance v. Martin, D.C., 12 F.Supp. 746.

"In our opinion the questions presented by the nine suits at bar are res adjudicata and this defense as asserted by the appellees is valid." Lehigh Valley R. Co. v. Martin, 3 Cir., 100 F.2d 139, 147.

Counsel for defendants contend that we have here the same issues, subject and parties as were involved in the New Jersey Supreme Court in the 1933 cases, and in this court in the 1932 cases, and, hence, these suits are barred by the doctrine of res adjudicata notwithstanding the fact that different taxable years are involved herein, the above quoted language being cited to substantiate their position. This court is not impressed with this argument, because it does not agree with counsel as to the extent to which the doctrine of res adjudicata will conclude "parties to a subsequent proceeding upon all questions determined by an earlier decision".

To understand the limitations of the doctrine the case of Cromwell v. County of Sac, 94 U.S. 351, 352, 24 L.Ed. 195, will furnish an excellent background. Therein the Court observed:

"In considering the operation of this judgment, it should be borne in mind, as stated by counsel, that there is a difference between the effect of a judgment as a bar or estoppel against the prosecution of a second action upon the same claim or demand, and its effect as an estoppel in another action between the same parties upon a different claim or cause of action. In the former case, the judgment, if rendered upon the merits, constitutes an absolute bar to a subsequent action. It is a finality as to the claim or demand in controversy, concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose. * * * The language, therefore, which is so often used, that a judgment estops not only as to every ground of recovery or defence actually presented in the action, but also as to every ground which might have been presented, is strictly accurate, when applied to the demand or claim in controversy. Such demand or claim, having passed into judgment, cannot again be brought into litigation between the parties in proceedings at law upon any ground whatever.

"But where the second action between the same parties is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered. In

all cases, therefore, where it is sought to apply the estoppel of a judgment rendered upon one cause of action to matters arising in a suit upon a different cause of action, the inquiry must always be as to the point or question actually litigated and *determined in the* original action, not what might have been thus litigated and determined. Only upon such matters is the judgment conclusive in another action." 94 U.S. 351, 352–353, 24 L.Ed. 195.

In Tait v. Western Md. R. Co., 289 U.S. 620, 53 S.Ct. 706, 77 L.Ed. 1405, the contention was made that a judgment in a suit concerning income taxes for a given year could not estop either of the parties in a later action touching liability for taxes of another year, because the scheme of the Revenue Acts is an imposition of *tax for annual periods, and the exaction* for one year is distinct from that for any other. Therein a deduction from gross income covering an amortized proportion of the discount on the sales of bonds was claimed for the years 1918 and 1919 which was disallowed by the Board of Tax Appeals, but ultimately allowed by the Circuit Court of Appeals, 4 Cir., 62 F.2d 933. Deductions on the same grounds were claimed for the years 1920–1925, and the District Court held that "no facts were presented which had not been before the Board of Tax Appeals in the litigation over the 1918 and 1919 taxes", and that the parties were concluded by the former decision. This conclusion was affirmed by the Circuit Court of Appeals. The court stated:

"The scope of the estoppel of a judgment depends upon whether the question arises in a subsequent action between the same parties upon the same claim or demand or upon a different claim or demand. In the former case a judgment upon the merits is an absolute bar to the subsequent action. In the latter the inquiry is whether the point or question to be determined in the later action is the same as that litigated and determined in the original action. Cromwell v. County of Sac, 94 U.S. 351, 352, 353, 24 L.Ed. 195; Southern Pacific R. Co. v. United States, 168 U.S. 1, 48, 18 S.Ct. 18, 42 L.Ed. 355; United States v. Moser, 266 U.S. 236, 241, 45 S. Ct. 66, 69 L.Ed. 262. Since the claim in the first suit concerned taxes for 1918 and 1919 and the demands in the present actions embraced taxes for 1920–1925, the case at bar falls within the second class [289 U.S. 620, 623, 53 S.Ct. 706, 707, 77 L. Ed. 1405.]

* * *

"Is the question or right here in issue the same as that adjudicated in the former action? The pertinent language of the revenue acts is identical; the regulations issued by the Treasury remained unchanged, and of course the facts with respect to the sale of the bonds and the successive ownership of the railroad property were the same at the time of both trials. * * * the Circuit Court of Appeals has found that all the facts stipulated in the present cause were before it in the former one, and we accept this finding." 289 U. S. 620, 625, 626, 53 S.Ct. 706, 708, 77 L.Ed. 1405.

The court concluded that the prior judgment relative to the years 1918–1919 was an estoppel to the suit for the subsequent years under consideration. It is significant to observe that the crux of the above case is that the facts presented in the former litigation were identical with those presented in the subsequent litigation.

This court does not feel that the disposition made by the Supreme Court of New Jersey in the 1933 cases precludes a decision upon the merits of the cases involved herein. And for the same reason the disposition of the 1932 and 1933 cases by this court is not preclusive of an investigation of the merits of the methods used by the State of New Jersey in determining "true value". Indeed, this court therein expressly declined to approve or justify the method used in the following language: "It is desirable to emphatically point out that this opinion is not to be considered as a justification or an approval of the methods of the taxing authorities of this state in taxing plaintiffs' property. It is held here, rather, that in these cases involving the taxes for the year 1932 the plaintiffs at most have shown that the taxes imposed exceed what they feel they should be taxed, and, upon analysis, the method suggested by them appears as arbitrary as they charge that of the taxing authorities to be, unsupported by the necessary underlying proof of the accuracy of their calculations." Lehigh Valley R. Co. v. Martin, D.C., 19 F.Supp. 63, 82. Clearly, this court is not precluded from considering the merits of the method of assessment within the State of New Jersey, because of a prior decision in this

same court involving different years which expressly declined to consider the merits of that method.

This court, therefore, sees no additional merit to these contentions and will proceed to a determination of the subject matter of these cases.

*Plaintiffs' Contention for System or Unit Valuations*

The plaintiffs contend that the true values of their properties cannot be ascertained without first determining their value as a whole regardless of state lines, and then allocating a portion of that sum to the State of New Jersey. This is based upon the fact that railroads are rarely sold on the market piecemeal but as a whole, and the fact that a section of a railroad is of no value unless connected with the whole—in other words, it has no disjunctive value. A witness for the plaintiffs made the following observation in this connection—"A railroad in two or more states must still be valued as a unit just as a house on the land between two states must be valued as a unit and values allotted between the two states."

It is urged that the proposed method of valuation would tend to equalize values throughout the system, inasmuch as the State of New Jersey is one of geographical uniqueness. This uniqueness is due to the fact that there are relatively few railroad miles within the state, but this factor, it is argued, is fully balanced by the existence of large terminal properties, which serve as a depository and distribution point for goods shipped from and to all parts of the country and abroad.

*Plaintiffs' Method of Computing System or Unit Value*

In computing system values several methods have been proposed, namely

A. By capitalizing the earnings.

B. By an analysis of the stock and bond valuations.

C. By a composite of the above two valuations.

It is submitted that true value can best be determined generally by a determination of the net operating income and a capitalization of that income. An illustration of this method is as follows: If a railroad system earns $6,000 in a given year and if 6 per cent. is a fair rate of return on an investment in that year, the value of the system capitalized at such rate of return would be $100,000. In this method two problems appear. In the first place, the earnings of any one year do not reflect prospective earnings. Secondly, the method calls for judgment in the determination and application of a fair rate of return. Past and future conditions must be considered in determining whether the rate of return should be four, five or six per cent., et cetera. Thus, it becomes necessary for the statistician to look into the past and find earnings and rates of income in order that he may fairly predict the future.

The statisticians tell us that if it were possible to forecast the net earnings of a property for each of the years in the future, it would be a simple mathematical calculation to obtain the present worth of those future earnings. Such a present worth figure would be almost conclusive as to value; but, unfortunately, the future cannot be accurately foreseen. We can only judge the future by the past, and so past and present earnings are more or less useful as the basis of estimating the future, but at best all that can be had as to future earnings is an estimate which, when, capitalized in a proper manner, gives an estimated earning value. If the estimate could be known to be perfect, it probably would be entitled to nearly 100 per cent. weight. But not being perfect it is submitted that all other factors and information must also be weighted in with it to fortify conclusions of value.

It is said that a sufficient number of years should be taken into consideration to be fairly representative of future conditions. It is customary in railroad taxation to base this prediction upon the average of a five year period. What years to average is perplexing. Railroads like other enterprises have their good and bad periods. Their earnings seem to follow the business cycles of the nation. Therefore, to get a fair cross-section of the earning power of a railroad as indicated by its past operations, it would appear that for valuation purposes the net earnings should be as nearly as possible averaged over a period covering a complete business cycle.

Having made an estimate of future earnings it becomes necessary to arrive at a rate of capitalization. This will generally be based on the prevailing rate of interest necessary to attract capital into the industry. The rate most frequently used is six per cent., but it may be a too high or

too low rate for the company under consideration, depending on the type of company and the cost of borrowing money.

Summarizing this method, it is seen that it calls for expert judgment, and even then the best that can be said of it is that it is mere estimate. It presents problems of what the rate of return shall be, and what past years shall be averaged in order to forecast the future.

One particular objection is that the method assumes there is an income. We have throughout the country many railroad properties operating consistently with annual losses. Can it be contended that in such cases the property has no taxable value?

A second method of computing present value is the so-called stock and bond method. This system represents theoretically what a buying public considers the property worth, and is assumed by some to be a very good indication of what the property is worth for purposes of taxation. As in the first method discussed, it is the general practice to average the value of the securities over a period of years in order to arrive at a figure more nearly representative of present value. Its virtue lies in the fact that it is usually easy to ascertain the number of shares of stock and the par value of bonds outstanding. It is also easy to obtain the market value of the actively traded issues, leaving problems of estimates to such items as closely held issues, bank loans, or other special items.

But it is not so easy to select a period of averaging prices of securities so that the result will be informative as to the value of property at any particular time. For example, nearly everyone will concede that market prices of September 1929 have very little significance in determining the value of a property today. On the other hand, it is doubtful that the 1929 security prices had any relation to the value of the property they represented even in 1929. Furthermore, it is apparent that all of the day-to-day fluctuations in stock and bond prices cannot be explained by current changes in the value of the property.

Mr. Graham, witness for the defendants, made several objections to the stock and bond method—

"The first objection is that it involves an arbitrary choice of the period of time or the number of years to be averaged, and a different period of years will yield a different result.

"The second objection is more basic, and that is that averaging as a method of statistical procedure is useful only if on the one hand all the component figures are relative to the result you are seeking, and if secondly there is no reason to prefer one figure to another. (Record* 6812)

* * *

"The third difficulty is also a basic one, which is that the averaging of stock prices is in itself an admission that the stock prices do not represent a considered and dependable view of the value of the security, because if that were so, and if these prices were dependable, it would not be necessary to average prices at any particular time but it would be sufficient to take the price as of the date of the valuation, because in theory that stock price is supposed to represent not only the current earnings and current conditions, it is also supposed to reflect adequately the past record, and supposed to reflect adequately the future prospects of the securities. It is supposed to, and at some times it does, but the exceptions are so numerous that it cannot be said that the stock price really does reflect properly all the conditions which enter into the valuation of the security.

"That is admitted necessarily by resorting to the process of averaging the stock price, the purpose being to get away from the deficiency of the stock price on any particular date, but when you do that you are simply selecting other stock prices which themselves may suffer from the same deficiency, and averaging them, and, as I said before as to the theory of averages, the averaging of a number of separately non-representative figures will not give you a representative result." (R. 6816).

The ideology of the property being worth what the investing public considers its value is far from being infallible. The market value of securities does not in fact solely represent the investor's composite conception of the worth of the railroad property. In the case of bonds the maturity dates and whether or not the interest is guaranteed by another railroad will affect the price paid for them. Furthermore, one must bear in mind that there is a speculative interest in the security market as well as an investor's interest. When the speculation fever is rampant it runs far ahead of sound investment judgment. Con-

*Record of Testimony; hereinafter designated "R".

versely, when the market gets panicky, due to war-scares, political moves, or other forces which may or may not actually affect real values, then the security values plunge far below or soar far above the real worth of the property underlying the securities. Finally, the exchange market is very sensitive. A note of optimism in one branch of industry buoys up the securities in other branches wholly unrelated, and if something happens to adversely affect a certain industry, its securities are prone to plunge downward and carry other securities' values with it.

Assuming that the market value of the stocks and bonds measures the value of the assets of a railroad company, it must be determined what assets the company has other than the operating property subject to assessment. This property is termed non-operating property. Many of these items are wholly unnecessary in the operation of the transportation business, and to the extent that the value of these assets influence the investing public in its appraisal of the outstanding securities, to that extent such influence should be eliminated from the market value of stocks and bonds. Also it is well known that some companies own considerable idle non-operating properties which produce no income. In these cases, it is conceivable that the investing public will consider such properties a liability rather than as an asset, and to that extent the ownership of such property acts as a drag on the market value of outstanding securities. The value of these properties, then, should be added to the value of the stocks and bonds.

It will be observed from this analysis that it is not correct to assume that values are consistent with what the investing public pays for stocks and bonds. If one makes this assumption it must be decided what years in the past shall be averaged in order to predict the future. Finally, there is the perplexing problem concerning non-operating property. Aside from the problem of distinguishing between the two classes of property, the effect that non-operating property has upon the investing public is debatable, and resolves itself into a problem of judgment.

A third possible way of determining system value is to find the average of a composite consisting of a capitalization of system earnings and the value of the stocks and bonds. This method, obviously, possesses all the vices and virtues of the methods already discussed. Therefore, it will be unnecessary to consider further the problem of system valuation.

*Allocation of System Value*

The next problem is to break up this unit valuation and allot the proper portion of that value to the State of New Jersey. To do that we must determine what proportion of the whole is located within New Jersey. It is submitted that this proportion may be found by the use of certain allocation factors. A general discussion will follow describing the various factors that the railroads propose. All of these factors are not used in determining the true value of each of the various plaintiffs' railroads, but a portion of these factors or the average of a combination of such factors is utilized.

It is the general practice to make the allocation not on the basis of any one allocation factor, but on the basis of a number of factors combined in some fashion into a composite allocation factor. The reason for that is that any one factor taken by itself will tend to over-emphasize a certain phase of valuation.

The allocation factors to be discussed are as follows: (1) Road miles, (2) all track miles, (3) locomotive miles, (4) car miles (freight and passenger), (5) train miles (freight and passenger), (6) traffic units, ton miles and passenger miles, (7) reproduction cost and relative investment, and (8) gross revenue.

*Road Miles*

This is the lineal mileage of the center line of a railroad right of way, and represents the percentage that the miles of road located within the State of New Jersey bears to the miles of road of the whole system. Its virtue lies in the fact that it measures the territorial extent of the system. However, it is deficient and does not reflect the whole picture, because it assumes that a mile of road in one section of the system is equal to the value of a mile of road located anywhere within the system. At the present time a mile of road in one state may bear only slight resemblance to a mile of road in another state. More specifically, it has nothing to do with the width of the right of way, number of tracks, character or number of bridges, tunnels, stations, signals, grades, fills, terminals or other indicia of value. Lastly, it assumes that each mile of road earns the same income as any other mile of road.

*All Track Miles*

This factor represents the percentage that all of the miles of track within the State of New Jersey bears to all of the miles of track in the whole system. Much merit for its use in New Jersey is claimed by reason of the fact that it is said to reflect the value of the terminal properties due to the unusual amount of trackage surrounding the same. The theory underlying its use as an allocation factor is that the extent of the tracks measures the extent of the business. That, however, assumes that each mile of track produces the same amount of revenue. It may be further criticized because it gives equal weight to tracks in terminals and in yards as it gives to trackage on the main right of way, which may be much more expensive to construct.

*Locomotive Miles (Freight, Passenger and Switching)*

This factor represents the percentage of locomotive miles produced within New Jersey. It may be expressed separately in terms of freight, passenger and switching locomotive miles. As an allocation factor it is claimed to measure the extent and volume of the business. It does not take into account fully the difference between transportation productivity between one portion of a line and another. The factor is also objectionable unless it takes into consideration the difference between locomotive miles in passenger, freight and switching service.

*Car Miles (Freight and Passenger)*

The percentage of car miles attributable to New Jersey is another factor claimed to measure business activity. Its weakness lies in the fact that it does not include switching movement in the yards and in the fact that in the more congested areas car miles do not build up so rapidly. Miles of car per day cannot accumulate in areas like the New Jersey terminal district as compared with other districts where there is a freer movement of cars. It does not take into account the difference in revenue per car mile or in expense per car mile as between freight, passenger and commuting service.

*Train Miles (Freight and Passenger)*

The objection to the percentage of train miles is that they are credited whether a train is handling one car or one-hundred cars per train, one or two passenger cars or ten to fifteen passenger cars per train. A large amount of train mileage may be built up in certain districts of the same road which produces a small amount of ton miles, or car miles, while in other districts a small amount of train miles may produce a large amount of ton miles and car miles. If the number of cars and the type of goods transported were uniform this would be a better factor.

A further objection is that train miles do not take into consideration the earnings and expenses of switching operations, nor the differences in gross and net earnings as between passenger and freight service, nor differences in gross and net earnings for a given service on various parts of the line.

*Traffic Units*

(a) Ton Miles (Gross or Net)

(b) Passenger Miles

Traffic units also are intended to measure the business activity and the use of the property. Net ton miles are the net weight of the car. The gross ton miles include both the lading and the weight of the car as well as empty cars. Passenger miles include the number of passengers multiplied by the number of miles. When a ton of freight moves one mile that is a traffic unit. When one revenue passenger travels one mile that is likewise a traffic unit. This factor is said to possess the virtue of uniformity among the states, that is to say, a ton is a ton, a passenger is a passenger, and a mile is a mile in every state. However, it does not reflect the relative earning power of the traffic transported. If every ton mile produced the same revenue over the whole system then this factor would measure accurately the relative gross revenue, and if passenger miles produced the same revenue on every part of the system, passenger miles would represent accurately the relative division of the passenger revenue.

A combination of ton miles and passenger miles, when utilized, does not take into account differences in operating expenses per mile unit as between freight and passenger service.

Lastly, net tons do not take into account the number of cars in a train. It might happen that there would be so many empty cars in the train that the cost of pulling these cars would offset the income derived from the tonnage transported. A similar objection can be made to the gross tonnage factor, because the tonnage capacity of cars varies. A train consisting of

cars of large capacities could transport a large amount of tonnage with less cars than a train consisting of cars of small capacity.

*Reproduction Cost and Relative Investment*

These factors seemed to be based upon valuations made by the Interstate Commerce Commission. Mr. Burpee, witness for the plaintiffs, stated that reproduction cost is not necessarily important, other than to determine whether the value based on earnings is consistent with the investment. The percentage of relative investment is claimed to reflect the difference involved in an investment on one part of the system as distinguished from another. Either of these factors would seem to give some weight to the terminal properties within New Jersey. But either factor used alone could not have much utility as the reproduction cost or investment in a property is no indication of its value. Dr. Badger, witness for plaintiffs, was of the opinion that a 25 per cent. weight accorded to the relative investment factor would be sufficient.

The obvious objection to any cost factor is that it assumes an equality of value in each dollar of investment, or that an investment of $1,000,000 in one state is as valuable as a similar investment in another state.

*Gross Revenue*

The percentage of this factor attributable to New Jersey is used in the case of the Central Railroad of New Jersey, because this company is the only plaintiff which maintains separate accounting of its New Jersey operations. Gross earnings are of value to a road only in proportion as they produce net receipts. It may be criticized because it does not take into account the differences in operating expenses on different portions of the system, and because it is difficult to apportion properly the earnings derived from interstate commerce.

The above discussion has been confined to separate analyses of the various allocation factors used in the plaintiffs' calculations. The court is not unmindful of the fact that the defects in a particular factor when used alone will be neutralized or diluted when arranged with other factors. On the other hand, the defects may be accentuated in combination with other factors. It, therefore, becomes necessary to consider what has been said of these factors when combined and arranged together in various combinations. It will be unnecessary to go beyond the testimony of Mr. Burpee and Dr. Badger, witnesses for the plaintiffs, to discern the weakness of the method.

It appears that no combination of factors can be used universally. Conditions in one state or one railroad may demand the use of combinations different from those used in other railroads and states. Mr. Burpee stated that the best that could be hoped for was a reasonable approximation. Both these witnesses agree that system valuations as well as the selection of formulae or allocation factors is a matter of judgment. Even experts will disagree in their judgment, and as a matter of fact Dr. Badger and Mr. Burpee used different factors, and, of course, obtained different results. The following table indicates the amounts reached in some of the railroads under consideration, and that the differences are by no means nominal:

| | 1934 (value) | 1935 (value) | 1936 (value) |
|---|---|---|---|
| Lehigh Valley RR. | | | |
| Burpee ............ | $22,000,000 | $22,000,000 | $22,000,000 |
| Badger ............ | 20,000,000 | 20,000,000 | 21,000,000 |
| By other formulae | 16,234,110 | 14,503,450 | 16,189,450 |
| Delaware, Lackawanna & Western | | | |
| Burpee ............ | $47,000,000 | $46,000,000 | $47,000,000 |
| Badger ............ | 45,000,000 | 43,000,000 | 40,000,000 |
| By other formulae | 33,563,280 | 27,654,220 | 26,396,510 |
| N. Y. Central | | | |
| Burpee ............ | $ 9,000,000 | $ 9,000,000 | $11,000,000 |
| Badger ............ | 8,370,000 | 11,040,000 | 11,280,000 |
| By other formulae | 9,484,670 | 8,468,380 | 8,942,370 |
| Central of N. J. | | | |
| Burpee ............ | $70,000,000 | $65,000,000 | $58,000,000 |
| Badger ............ | 52,000,000 | 48,000,000 | 49,000,000 |
| By other formulae | 59,709,780 | 52,835,820 | 52,444,060 |
| Erie R.R. | | | |
| Burpee ............ | $21,000,000 | $25,000,000 | $27,000,000 |
| Badger ............ | 24,500,000 | 26,620,000 | 29,040,000 |
| By other formulae | 26,075,830 | 25,065,280 | 26,632,330 |

The allocation factors used in the case of the Lehigh Valley Railroad are as follows: Mr. Burpee found a percentile average of a composite consisting of: (1) Interstate Commerce Commission valuation plus net additions to end of period, (2) all track miles at end of period, (3) locomotive and car miles combined and averaged over the period, and (4) net ton and passenger miles combined and averaged over the period. Dr. Badger used (1) average of the per cent. of all track miles and road miles, (2) per cent. of ton miles and passenger miles combined, (3) average of the per cent. of locomotive miles and car miles, and (4) relative investment

(equipment apportioned on basis of locomotive miles, car miles and 50 per cent. for floating equipment). The average of (1) to (4) was deemed by Dr. Badger the percentage of property within New Jersey. Under the result reached in the third approximation of the above table (designated, "By Other Formulae") an average of the percentages of the following factors was deemed the percentages of property within New Jersey; (1) miles of road, (2) miles of track, (3) locomotive miles, freight, (4) locomotive miles, passenger, (5) locomotive miles, switching, (6) car miles, freight, (7) car miles, passenger, (8) train miles, freight, (9) train miles, passenger, (10) gross ton miles, and (11) reproduction costs.

In the case of the Delaware, Lackawanna & Western Railroad, Mr. Burpee and Dr. Badger used the same factors as in the case of the Lehigh Valley Railroad. Under the third result reached in the above tabulation an average of the percentages of the following factors was deemed the percentage of property within New Jersey: (1) Miles of road, (2) miles of all track, (3) locomotive miles, (4) car miles, (5) net ton and passenger miles, and (6) reproduction costs.

In the case of the New York Central Railroad Mr. Burpee used a composite factor consisting of the percentile average of (1) Interstate Commerce Commission valuation at end of period, (2) all track miles at end of period, (3) locomotive and car miles combined and averaged over the period, (4) car miles (repeated), and train miles (in the absence of ton and passenger miles) averaged over the period. Dr. Badger used the same factors as he used in the case of the Lehigh Valley Railroad but instead of using ton miles and passenger miles which were unavailable he substituted an average of the percentage of car miles and train miles. Under the third result reached in the case in the above table an average of the percentage of the following factors was deemed the proportion of property within New Jersey, (1) miles of road, (2) miles of all tracks, (3) locomotive, (4) train miles, (5) car miles and (6) cost of reproduction.

In the case of the Central Railroad of New Jersey Mr. Burpee used the same factors as in the Lehigh Valley Railroad but added a fifth factor—the gross revenue averaged over the period. (This railroad maintains a separate accounting of its operation within New Jersey; hence the availability of this factor.) Dr. Badger used the same factors as in the case of the Lehigh Valley Railroad except that he added a fifth factor, percentage of gross earnings, which was averaged with the other four factors, the result being deemed the percentage of property within New Jersey. Under the third result in the above table an average of the per cent. of the following factors was deemed the per cent. of property within New Jersey: (1) Miles of road, (2) miles of all track, (3) locomotive miles, (4) car miles, (5) net ton and passenger miles, (6) gross operating revenues, and (7) reproduction costs.

In the case of the Erie Railroad Mr. Burpee and Dr. Badger used the same factors as in the Lehigh Valley Railroad. Under the third result in the above table an average of the following factors was deemed the percentage of property within New Jersey: (1) Miles of road, (2) miles of all track, (3) locomotive miles, (4) train miles, (5) car miles, (6) gross ton miles, (7) cost of reproduction.

While Dr. Badger and Mr. Burpee apply the same factors to some of the railroads, it is to be noticed that under the third method the factors vary in each railroad.

Mr. Burpee testified that if the proper formulae were derived for each state that the aggregate net railway operating income could be allocated so that no state would have more than its share, and that the total alloted to each state would equal system value. He added, however, that he had never tried to devise such a formula. (R. 3823) Dr. Badger also testified in this connection. He was asked: "Is there any specific formula that you could use to determine value of the property in each state, and when you got through you could add those figures together and get the total system value that you started with?" He answered: "I think you would get substantially the total system value that you started out with." But he qualified his answer by adding that he had not tried it in any of these cases. (R. 4329)

The testimony of these witnesses does not convince the court that too much reliance can be placed upon a formulaic valuation. This conclusion is induced by the fact that even Dr. Badger and Mr. Burpee reached different conclusions which difference is by no means negligible. It, however, is not contended that this court is

called upon to choose the formula that should be used. If this were the fact, the court, in effect, would be determining value, and its power to do this has very definite limitations. The plaintiffs only represent that these formulae be used to demonstrate the excessiveness of the valuations. But even with their use thus confined, it does not seem that these principles can be used as a check upon the valuations already assessed, or that it would be advisable to compel the tax assessors to use these formulae as a limit beyond which they cannot extend. If the judgment of the tax assessors varied as much as the judgment of Dr. Badger and Mr. Burpee it is conceivable that through the selection of certain factors and the weight to be given to such factors the judgment of the assessors could be so exercised as to correspond with the valuations being tested.

A formulaic method of valuation is further complicated by the fact that under the New Jersey Railroad Tax Act hereinbefore set out it is the duty of the board of assessors to make separate valuations of the four classes of property into which railroads are divided. Also, the same act provides that a tax at the local rate for the year upon the Class II property of each railroad company located in each local taxing district shall be levied and that the entire amount of such tax shall be allotted and paid over to the local taxing district in which the particular items of such property are located. Revised Statutes of New Jersey 1937, 54:24-7 et seq., N.J.S.A. 54:24-7 et seq.

It will be observed that the formulae proposed by the plaintiffs furnish an undivided sum to be allocated to the State of New Jersey. To effectuate the tax act it will be necessary to break up this sum into parts representing four classes of property. It would follow that this reallocation must be based upon a method similar to the original allocation whereby the undivided sum was allocated to New Jersey. The objection to the allocation factors will become twofold in this event, and the possibility of error accentuated.

It is strange that neither Dr. Badger nor Mr. Burpee developed their principles to the extent of showing their utility in assigning values to the four classes of property. Dr. Badger was asked, "How would you use your formula * * * to ascertain the value of the main stem, or first class railroad property, required by our statute to be separately valued?" His reply thereto was as follows: "Without going into the situation at more length than I have, I would not undertake to say how I would divide the property up as among different classes within the State of New Jersey." (R. 4329) Mr. Burpee likewise gave equivalent testimony in this connection: "I have not devised any formula for separating the different properties in the State of New Jersey, one from the other, or the properties in the different counties in New Jersey, but I believe that once the true value of the system was allocated to New Jersey a formula could be devised that would be fair to each locality. *I have not gone that far.*" (Italics supplied) (R. 3834) The method, however, is not to be condemned without a review of the legal authorities on the problem.

Taxation based upon an allocation of system value has been approved by the courts. Pittsburg C. C. & St. L. R. Co. v. Backus, 154 U.S. 421, 14 S.Ct. 1114, 38 L.Ed. 1031; Cleveland C., C., & St. L. R. Co. v. Backus, 154 U.S. 439, 14 S.Ct. 1122, 38 L.Ed. 1041; Rowley v. Chicago & N. W. R. Co., 293 U.S. 102, 55 S.Ct. 55, 79 L.Ed. 222; Atchison, T. & S. F. R. Co. v. Sullivan, 8 Cir., 173 F. 456; Norfolk & W. R. Co. v. Board of Public Works of W. Va., D.C., 3 F.Supp. 791; Pleasant et al. v. Missouri-Kansas-Texas R. Co., 10 Cir., 66 F.2d 842.

This does not mean, however, that such a method of calculation is infallible. The cases of Union Tank Line Co. v. Wright, 249 U.S. 275, 39 S.Ct. 276, 63 L.Ed. 602; Fargo v. Hart, 193 U.S. 490, 24 S.Ct. 498, 48 L.Ed. 761, and Wallace v. Hines, 253 U.S. 66, 40 S.Ct. 435, 64 L.Ed. 782, demonstrate that even an allocation of system value may be erroneously applied.

In a few cases courts have undertaken to determine the true value of a railroad located within a state. The cases of Chicago & N. W. R. Co. v. Eveland, 8 Cir., 13 F.2d 442; Mobile & O. R. Co. v. Schnipper, D.C., 31 F.2d 587; Bailey v. Megan, 8 Cir., 102 F.2d 651; Northern Pacific R. Co. v. Adams County, D.C., 1 F.Supp. 163 (Reversed in part on other grounds in Chicago. M. St. P. & P. R. Co. v. Adams Co., 9 Cir., 72 F.2d 816), and Great Northern R. Co. v. Weeks, 297 U.S. 135, 56 S.Ct. 426, 80 L.Ed. 532, are illustrative of this class.

The limitations beyond which a court cannot act in reviewing a tax as-

sessment are set forth in Great Northern Railway Co. v. Weeks, supra, as follows: "* * * Courts decline to disturb assessments for taxation unless shown clearly to transgress reasonable limits. Overvaluation is not of itself sufficient to warrant injunction against any part of the taxes based on the challenged assessment; mere error of judgment is not enough; there must be something that in legal effect is the equivalent of intention or fraudulent purpose to overvalue the property and so to set at naught fundamental principles that safeguard the taxpayer's rights and property. Rowley v. Chicago & N. W. Ry., 293 U.S. 102, 109-111, 55 S.Ct. 55, 79 L.Ed. 222." 297 U.S. 135, 139, 56 S.Ct. 426, 428, 80 L.Ed. 532.

In Chicago & N. W. R. Co. v. Eveland, supra, the court condemned an assessment of the State of South Dakota which amounted to $33,882 per mile of road, and made an injunction final which restrained the collection of over 70 per cent. of the tax, because the court did not think that the assessment should have been more than what had already been paid. The court held that the tax commission erred in that it failed to give sufficient consideration to the earnings and value of the stock and bonds of the plaintiff company. These facts were considered by the court in arriving at system value, and an apportionment of such value was allotted to South Dakota on the basis of intrastate and interstate earnings, the latter factor being a derivative of a mileage proportionate. Power to make this adjustment was found in the fact that past valuations had been systematically excessive, and, therefore, a fraud upon the plaintiff.

Mobile & O. R. Co. v. Schnipper, supra, presents a case wherein the court found that no property in Illinois was assessed at more than 47 per cent. of its true value while property of plaintiff was assessed at full value. The defendant in rebuttal to this finding contended that the assessment of $6,797,999 was too low. The court made a series of calculations based upon system value and an apportionment to Illinois, and concluded that the property could not under any of its tests be worth more than $8,599,830 of which 47 per cent. would amount to $4,041,920. This court gave itself power to make the adjustment because the assessment was grossly excessive, and, therefore, fraudulent. Its comments in this connection are as follows: "No difference in judgment as to the value of the property between the tax commission and the court can be sufficient to impeach the valuation of the board. But we must recognize likewise that an overvaluation may be so excessive, and made under such circumstances, as to justify only the conclusion that it was not honestly made, and was known to be excessive, and that the willful disregard by members of the commission of their constitutional duty for the purpose of producing a result which would not otherwise be produced is properly urged against an assessment as fraud. See People's Gaslight & Coke Co. v. Stuckart, 286 Ill. 164, 121 N.E. 629; Raymond v. Chicago Union Traction Co., 207 U.S. 20, 28 S.Ct. 7, 52 L.Ed. 78, 12 Ann.Cas. 757; Pacific Hotel Co. v. Lieb, 83 Ill. 602; People v. Keokuk & Hamilton Bridge Co., 287 Ill. 246, 122 N.E. 467." D.C., 31 F.2d 587, 592.

Bailey v. Megan, 8 Cir., 102 F.2d 651, is a case wherein the trustee in reorganization of the property of the Chicago and North Western Railway Company contended that the assessment for taxes against the property of the railroad should be reduced to one-half of $23,275,000, the actual assessment. The court determined the maximum system value and the maximum portion of that value which could properly be allocated to the State of South Dakota. As a result of these calculations it enjoined the collection of 35 per cent. of the taxes levied.

In the case of Northern Pacific Ry. Co. v. Adams County, supra, the court was concerned with assessments against the Northern Pacific Ry. Co., the Milwaukee Company, and the Spokane Company, all the stock of the latter being owned equally by the two former companies. The court used a series of calculations to demonstrate the excessiveness of the assessments. It gave itself power to correct these assessments, because they were either arbitrary and capricious or were arrived at by the use of fundamentally wrong principles, and were so grossly excessive as to amount to constructive fraud. In the case of the Northern Pacific Company the court arrived at system value by the use of a composite consisting of a three year average of the value of the stocks and bonds, less non-operating property, a capitalization of income at six per cent. averaged over the same period, and cost of reproduction according to the Interstate Commerce Com-

mission valuation. The two former being given 40 per cent. weight, and the latter only a 20 per cent. weight. This sum was allocated to the State of Washington by the use of a percentile composite consisting of the relative operating track mileage which was given ⅔ weight, and the relative reproduction cost which was given ⅓ weight. The system value of the Milwaukee Company was determined in the same fashion, but the allocation was based only upon the percentage of the relative operating trackage. (Stock and bond values and income averaged three years in 1926 assessment and four in the 1927 assessment.) The system value of the Spokane Company was determined by the use of a composite consisting of the income averaged over a three year period capitalized at 6 per cent. which was given 80 per cent. weight, and cost of reproduction which was given 20 per cent weight. An allocation was made on the basis of relative operating mileage.

In Great Northern Ry. Co. v. Weeks, supra, the Court was concerned with assessments by the State of North Dakota against the plaintiff for the year 1933. The tax board had computed assessments in previous years on the basis of system value. This value was based upon a composite consisting of the value of the stocks and bonds less non-operating property, and a capitalization of earnings which was allocated to the state. For the year 1933 the board used the 1932 assessment, deducting only the value of a short stretch of track which had been removed. The Court held that if the same method of arriving at taxable value had been used in 1933 as had been used in 1932 "it would have been less by about $13,000,000", and "that by * * * system overvaluation the North Dakota assessment was too high by $15,000,000", and "resolving all doubts in favor of validity * * * the challenged assessment exceeds the true and full value * * * by $10,000,000". The Court found power to reduce the assessment in the amount of $10,000,000, because the assessment was arbitrary and excessive. The opinion, however, specifically stated that "it is without prejudice to the authority of the state board of equalization, if any it has, again to assess petitioner's properties for 1933".

Rowley v. Chicago & N. W. R. Co., supra, presents a case wherein the State of Wyoming had determined system value and had allocated a portion of such value to the State of Wyoming on the basis of a composite consisting of an average of the percentage of traffic units (ton and passenger miles), rolling stock (car and engine miles), operating revenue, and mileage attributable to the state. The lower court (Chicago & N. W. R. Co. v. Rowley, D.C., 1 F.Supp. 729) was of the opinion that the mileage factor was improper because the road in Wyoming was not worth as much as it was elsewhere, and, therefore, eliminated it from the allocation composite. This reduced the valuation from $7,881,003.04 to $6,278,534.14, and the state was restrained from collecting anything in excess of the latter figure. The Supreme Court made this comment in reference to the lower court's adjustment of the tax: "The trial court was not called upon, and it was no part of the judicial function, to determine the base or amount of the tax that in its view might legally be exacted as a result of the assessment in question. State Railroad Tax Cases, 92 U. S. 575, 614, 615, 23 L.Ed. 663; Thompson v. Allen County, 115 U.S. 550, 6 S.Ct. 140, 29 L.Ed. 472. Cf. Central Kentucky Gas Co. v. Railroad Comm'n, 290 U.S. 264, 271, et seq., 54 S.Ct. 154, 78 L.Ed. 307. If that assessment were illegal, the State, notwithstanding any adjudication against its validity as repugnant to the Federal Constitution, should have been left free again to value the property. Norwood v. Baker, 172 U.S. 269, 293, 19 S.Ct. 187, 43 L.Ed. 443. And see French v. Barber Asphalt Paving Co., 181 U.S. 324, 344, 21 S.Ct. 625, 45 L.Ed. 879." 293 U.S. 102, 111, 55 S.Ct. 55, 59, 79 L.Ed. 222.

In the case of City of Detroit v. Detroit & Canada Tunnel Co., 6 Cir., 92 F.2d 833, assessments were made upon a tunnel and its adjoining terminals on the basis of actual cost, less deductions which were uniform for all property, and 2 per cent. per annum for depreciation. The court held that the taxing authorities in adhering to cost less depreciation as a formula for arriving at true value, and ignoring the capitalized income method proceeded upon a fundamentally wrong basis. The lower court corrected the assessment by capitalizing the income at 7 per cent. and added $35,000 for present value of possible future increased earnings, and enjoined the collection of any sum in excess of the amount found by the court to represent true value.

The court made this comment in reference to the lower court's decree:

"* * * It provides (par. 6) that, upon payment of the amounts ordered to be the assessors might reasonably differ from paid, the Company and its receiver and trustee shall be forever released and discharged from any and all liability on account of the taxes for the years in controversy; and it enjoins (par. 9) the collection of any ad valorem taxes on the property other than the amounts ordered to be paid. The effect of these provisions is to fix definitely the amount of taxes that might be legally exacted for the years involved. This was no function of the court. See Rowley v. Chicago & N. W. R. Co., 293 U.S. 102, 111, 55 S.Ct. 55, 59, 79 L.Ed. 222; In re Lang Body Co. (John J. Boyle, Treas., v. John C. Hipp, Trustee) (C.C.A. [6 Cir.]) 92 F.2d 338, decided October 11, 1937. The decree should have left the taxing authorities free to make a new assessment if they could and wished to do so. Rowley v. Chicago & N. W. Ry. Co., supra, 293 U.S. 102, at page 112, 55 S.Ct. 55, 59, 79 L.Ed. 222; Great Northern Ry. Co. v. Weeks, supra, 297 U.S. 135, at page 153, 56 S.Ct. 426, 435, 80 L.Ed. 432.

"Paragraph 11 of the decree provided: '11. That this Decree shall be held to be without prejudice to the authority of the respondent taxing authorities or any other administrative body, if there shall be any such authority under the law, again to assess the properties of the defendant company for the said three years *in accordance with the terms and conditions of this Decree and the principles and findings set forth in the Findings of Fact and Conclusions of Law filed herein.*' (Italics ours.)

"This paragraph attempted to follow the procedure pointed out in the Rowley and Weeks Cases but is faulty in that it restrained the taxing authorities from fixing any higher valuations than those the court itself had established as a basis for its injunction, thus again constituting itself the ultimate assessor. The decree, as affirmed, is remanded, with directions to revise Paragraphs 6, 9, and 11 to eliminate the defects indicated, and so revised, to declare that it is without prejudice to the right of the taxing authorities if any they have, again to assess the property for the years involved.

"It is conceivable that a capitalization on a different basis than that used by the District Court (7 per cent.) as the basis for its injunction might not be invalid and that the court as to the amount to be added 'for the present value of possible future increased earnings.' It is also conceivable that the land and buildings valued purely as real estate for business purposes apart from the tunnel might well have an actual true cash value higher than the capitalized earning value of the entire property. These are but elements of the controversy which the taxing authorities could and should consider and which are foreclosed to them under the present form of the decree." 6 Cir., 92 F.2d 833, 837–838.

No case has been found in which a court has held that it is mandatory upon a taxing board to use a system valuation and an allocation formula in determining the value of a road within a state. The most that can be said of this method is that it has been approved by the courts in cases where it has been adopted by the taxing authorities, and in some instances it has been used by the courts in determining value. The cases already considered indicate that a court is definitely bridled in determining value, or interposing its own judgment for that of the taxing authorities. Some cases, however, have been disposed of by the court acting as the tax assessor, but this court will not undertake to superimpose its judgment on the matter of valuations. Indeed, even the plaintiffs do not expect the court to make such findings for they say in their reply brief, page 7, "The Court is not called upon to prescribe any precise formula for valuing the properties for taxation, nor is it the Court's province to restate the assessments". Rowley v. Chicago & N. W. Ry. Co. supra, Great Northern Ry. Co. v. Weeks, supra, and City of Detroit v. Detroit & Canada Tunnel Co. supra, clearly show that even in cases where the assessment is grossly excessive and fraudulent or fundamentally erroneous, the taxing authorities must be given another opportunity to correct the abuse.

Therefore, the cases reviewed above do not indicate that this court has authority to bind the taxing authorities of New Jersey to the use of the formulaic methods presented by the plaintiffs in determining its valuations. Moreover, our analysis of the methods themselves failed to convince us of their utility or their value as a limitation beyond which the New Jersey tax-

ing authorities may not extend their valuations.

*Consideration of New Jersey Method of Determining Values*

It, therefore, becomes necessary to consider the principles upon which the valuations as made are based. The following tables setting forth the franchise assessments, total assessments (inclusive of franchise valuations), and system earnings of the several railroads for the past ten years will serve to aid an analysis of the principles upon which the valuations are actually made. Reference to these tables will be made as this investigation proceeds.

Lehigh Valley Railroad Company
Assessment Values, 1926 to 1936, Inclusive.

| Tax Year* | Franchise Assessment | Total Assessment | System Earnings |
|---|---|---|---|
| 1926 | $1,000,000 | $39,751,686 | $14,592,971 |
| 1927 | 1,000,000 | 40,264,262 | 16,099,162 |
| 1928 | 1,000,000 | 41,294,624 | 17,996,581 |
| 1929 | 900,000 | 41,898,848 | 13,309,279 |
| 1930 | 900,000 | 44,765,010 | 15,992,670 |
| 1931 | 302,000 | 46,596,877 | 16,627,432 |
| 1932 | 302,000 | 46,351,532 | 11,217,785 |
| 1933 | 302,000 | 45,694,813 | 7,757,751 |
| 1934 | 292,467 | 44,428,521 | 5,881,199 |
| 1935 | 292,467 | 44,176,732 | 6,450,939 |
| 1936 | 292,467 | 43,286,018 | 7,344,977 |

*The tax year is preceded by the calendar year by two years, i. e., the 1924 taxes are due and payable in 1926.

The Delaware, Lackawanna and Western Railroad Company
Assessment Values, 1926 to 1936, Inclusive

| Tax Year | Franchise Assessment | Total Assessment | System Earnings |
|---|---|---|---|
| 1926 | $500,000 | $73,527,897 | $22,771,294 |
| 1927 | 500,000 | 75,468,565 | 21,725,278 |
| 1928 | 500,000 | 76,526,743 | 26,960,047 |
| 1929 | 450,000 | 77,948,242 | 24,810,213 |
| 1930 | " | 79,497,856 | 23,503,309 |
| 1931 | " | 82,137,269 | 24,144,483 |
| 1932 | " | 85,677,586 | 17,241,035 |
| 1933 | " | 85,836,862 | 12,475,688 |
| 1934 | 373,647 | 79,283,766 | 9,288,745 |
| 1935 | 373,647 | 77,671,977 | 8,196,176 |
| 1936 | 373,647 | 74,920,184 | 8,797,150 |

New York Central Railroad Company
Assessment Values, 1926 to 1936, Inclusive

| Tax Year | Franchise Assessment | Total Assessment | System Earnings |
|---|---|---|---|
| 1926 | $15,200 | $23,882,604 | $133,376,181 |
| 1927 | " | 24,833,053 | 149,011,420 |
| 1928 | " | 26,665,844 | 154,572,106 |
| 1929 | " | 27,575,331 | 135,604,883 |
| 1930 | " | 28,801,821 | 142,658,069 |
| 1931 | " | 29,811,955 | 143,472,194 |
| 1932 | " | 30,057,632 | 91,244,548 |
| 1933 | " | 30,010,862 | 60,290,908 |
| 1934 | " | 28,020,641 | 50,896,629 |
| 1935 | " | 28,110,728 | 59,725,799 |
| 1936 | " | 25,987,941 | 53,997,909 |

Central Railroad of New Jersey
Assessment Values, 1926 to 1936, Inclusive.

| Tax Year | Franchise Assessment | Total Assessment | System Earnings |
|---|---|---|---|
| 1926 | $1,999,000 | $ 92,949,912 | $14,800,385 |
| 1927 | 1,499,000 | 97,022,887 | 12,134,593 |
| 1928 | 999,000 | 102,132,397 | 12,686,385 |
| 1929 | 899,000 | 102,957,694 | 14,110,281 |
| 1930 | 899,000 | 105,218,047 | 14,431,283 |
| 1931 | 899,000 | 104,837,338 | 14,467,442 |
| 1932 | 835,000 | 104,061,272 | 12,276,604 |
| 1933 | 835,000 | 102,351,077 | 9,276,226 |
| 1934 | 835,000 | 97,951,002 | 7,754,742 |
| 1935 | 835,000 | 93,821,901 | 7,182,990 |
| 1936 | 627,000 | 87,291,161 | 8,065,980 |

Erie Railroad Company.
Assessment Values, 1926 to 1936, Inclusive

| Tax Year | Franchise Assessment | Total Assessment | System Earnings |
|---|---|---|---|
| 1926 | $359,800 | $41,012,054 | $19,857,906 |
| 1927 | 359,800 | 42,255,309 | 19,844,136 |
| 1928 | 358,800 | 44,424,109 | 20,878,323 |
| 1929 | " | 46,511,317 | 16,358,221 |
| 1930 | " | 47,269,237 | 22,784,815 |
| 1931 | " | 48,507,412 | 24,027,989 |
| 1932 | " | 48,410,772 | 18,164,194 |
| 1933 | " | 49,194,482 | 14,411,902 |
| 1934 | 259,149 | 48,493,831 | 13,033,929 |
| 1935 | " | 47,628,175 | 15,188,412 |
| 1936 | " | 45,938,958 | 15,895,187 |

New York, Susquehanna and Western Railroad Company.
Assessment Values, 1926 to 1936, Inclusive

| Tax Year | Franchise Assessment | Total Assessment | System Earnings |
|---|---|---|---|
| 1926 | $10,000 | $8,704,616 | |
| 1927 | " | 8,774,229 | |
| 1928 | 11,000 | 9,260,153 | |
| 1929 | 10,000 | 9,402,934 | |
| 1930 | " | 9,332,061 | |
| 1931 | " | 9,383,374 | $1,014,180 |
| 1932 | " | 9,004,335 | 1,007,553 |
| 1933 | " | 9,157,081 | 856,169 |
| 1934 | 5,000 | 8,440,519 | 834,068 |
| 1935 | " | 8,134,096 | 664,585 |
| 1936 | " | 8,069,317 | 639,790 |

New Jersey & New York Railroad Company
Assessment Values, 1926 to 1936, Inclusive

| Tax Year | Franchise Assessment | Total Assessment | Gross Revenues |
|---|---|---|---|
| 1926 | $1,000 | $ 851,714 | |
| 1927 | " | 886,194 | $1,626,065 |
| 1928 | " | 962,908 | 1,602,299 |
| 1929 | " | 986,957 | 1,595,976 |
| 1930 | " | 999,149 | 1,583,383 |
| 1931 | " | 1,172,298 | 1,542,907 |
| 1932 | " | 1,206,589 | 1,417,471 |
| 1933 | " | 1,301,516 | 1,312,213 |
| 1934 | " | 1,181,303 | 1,103,750 |
| 1935 | " | 1,225,678 | 939,120 |
| 1936 | " | 1,290,552 | 828,269 |

New York and Long Branch Railroad Company
Assessment Values, 1926 to 1936, Inclusive

| Tax Year | Franchise Assessment | Total Assessment | Gross Revenues |
|---|---|---|---|
| 1926 | $1,000 | $4,922,546 | $1,814,383 |
| 1927 | " | 4,941,509 | 1,931,079 |
| 1928 | " | 4,955,555 | 2,047,374 |
| 1929 | " | 5,108,576 | 1,933,259 |
| 1930 | " | 5,280,799 | 1,854,787 |
| 1931 | " | 5,305,289 | 1,834,742 |
| 1932 | " | 5,326,230 | 1,661,021 |
| 1933 | " | 5,115,628 | 1,198,731 |
| 1934 | " | 5,113,231 | 889,631 |
| 1935 | " | 4,906,006 | 751,632 |
| 1936 | " | 4,863,714 | 709,420 |

*Valuation of Land in New Jersey*

The record clearly indicates that land items are individually valued according to the value of adjacent lands. (R. 5645, 5656, 5682, 6052, 6053, 6058, 6066) Mr. Focht, Chief Engineer of the State Tax Department in charge of railroad valuation and taxes of railroad property, testified that such value could not be based on anything else.

The New Jersey courts have committed themselves on this type of evaluation. In Williams v. Bettle, 51 N.J.L. 512, 517, 518, 18 A. 750, 752, the Court of Errors and Appeals was concerned with the following statute: "* * * 'That if the assessed value of the real estate of persons other than railroad or canal corporations, in any taxing district wherein such railroad or canal property may be found, as ascertained by the assessors of such taxing district, is relatively lower than that which has been laid upon the land of the several companies in said taxing district, the said board (of state assessors) shall be required to accept said valuation of the assessors for such taxing district as a correct standard of value, and to thereby correct or reduce the separate valuation provided for in the second subdivision of section three of this bill.'" The court held this section of the tax act unconstitutional and made the following comment: "* * * The property so taxed would be assessed, not according to its own true value, but according to the true value of some other property. Such a tax the legislature cannot sanction. This attempt of the legislature to substitute for the 'true value' of railroad property 'the assessed value of the real estate of persons other than railroad or canal corporations' 'as a correct standard of value' for railroad property, is unconstitutional, and must fail."

We also have the case of Borough of Woodcliff Lake v. State Board of Tax Appeals, 117 N.J.L. 114, 187 A. 35, affirming the Supreme Court (182 A. 866, 14 Misc. 132) which in turn affirmed the judgment of the State Board of Tax Appeals, Report of Cases, State Board of Tax Appeals, July 1, 1934 to December 31, 1935, page 187, holding illegal and erroneous an assessment based upon an hypothetical use of property different from the use to which it was devoted on the assessment date. In its judgment the Board said: "The testimony of the Borough's experts was based upon physical characteristics and uses of the

land, other than those existing on the assessment date. They considered its use as an all year round development and its possible use for lake development by reducing the quantity of water in the reservoir, thus converting it into a smaller lake and creating additional upland which could be sold as lake front property. No expert for the Borough placed a value upon the land as used for reservoir purposes. Their valuations were hypothetical values as of October 1, 1933, based upon theoretical conditions and not upon the uses of the property on that date. *We cannot accept these valuations, as the property must be valued according to the condition in which the owner actually holds it on the assessing date.* The proofs establish that on that date the land was used for a reservoir and dam, as part of a water system, and that the water was up to the high level point; consequently the land must be valued for taxation purposes in that condition. In Colwell v. Abbott, 42 N.J.L. page 111, at page 115, the Supreme Court said: 'But if held by the owner as a farm or as an entire tract, the question is not what would this or that part of it sell for, if separated from the rest, but what would the property as it is—as the owner actually holds it—sell for, at a fair private sale?' In Trustees of Stevens Institute of Technology v. State Board of Taxes and Assessment, 105 N.J.L. 99, 143 A. 356; affirmed, 105 N.J.L. 655, 146 A. 919, the Supreme Court said: 'Property to be assessed, whatever may be its character, is to be taken and valued in the actual condition in which the owner holds it.'" (Italics supplied)

The scheme of state taxation of railroads as set up in the statute differs materially from the method of valuing and taxing other property in the state. This distinction gave rise to the contention that the act was invalid because the constitution requires all property to be taxed by general laws and uniform rules. It was held, however, in State Board of Assessors v. Central R. Co., 48 N.J.L. 146, 4 A. 578, that such provisions as to uniformity did not prevent the legislature from classifying property for special methods of taxation when there was a valid basis for such classification. The Chancellor made the following observations:

"In the act under consideration, the legislature has separated for taxation, not all the property of railroad and canal companies, but only so much of it as is used for the particular purposes of those corporations, and has imposed upon the property so separated a tax for state purposes, and tax for county and municipal purposes. The property of such companies not used for such special purposes is left to be taxed in the same manner as other like property. The property separated, so far as being taken by mere arbitrary selection, is all of it so circumstanced, by reason of the peculiar use to which it is put as to make it on that account a class by itself. To value and tax such property in the same way in which other property is valued, would be unjust. To do justice to the companies, and in common fairness, not only must the main stem of a railroad and the water-way of a canal be each valued and taxed as a unit, but the other property used in connection therewith, and for the same purposes, must also be valued and taxed with reference to such use. To make a just valuation thereof, property used for railroad or canal purposes must be estimated with regard to its value for such purposes. For example, the true value, for purposes of taxation, of railroad cuts and embankments and canal locks is not their cost, but what they are worth in connection with the works of which they form a part." 48 N.J.L. 146, 277, 278, 4 A. 578, 583.

* * *

"Railroad and canal property being peculiar property, which cannot, in justice to its owner, be valued in the same way as other property of a like nature, the legislature was bound to provide a proper method of valuing it justly for the purposes of taxation. Such method must be a peculiar one. The machinery provided for the purpose by the act—a state board of assessors—is appropriate, and such as is necessary in view of the peculiar character of the property." 48 N.J.L. 146, 280, 4 A. 578, 585.

It thus appears that railroad property is sui generis, and for that reason the taxing act has been held constitutional by the courts of New Jersey. If railroad property is subject to classification and taxation under this special act because of its characteristics and specific use, then it seems to be conclusive that it cannot be potentially or hypothetically unclassified or reclassified by the assessor in order to apply a standard or standards of value found in property not within the class. It cannot be railroad property in fact, and assumed to

be some other kind of property for the purpose of taxation without completely ignoring the law under which the assessor purports to act. The valuation of railroad lands based upon the values of non-railroad properties must be condemned as being beyond the intendment of the tax act.

*Valuation of Structures*

The evidence demonstrates that with respect to railroad structures the values are based upon the cost of reproduction, and then depreciated according to current physical condition (R. 5549), and in special instances with reference to "functional" depreciation. Mr. Focht gave the following comments in reference to the two types of depreciation:

"Functional depreciation is the result of lack of adaptation to function. It results from change of conditions and surroundings which render the structure ill adapted to its work, from the growth of business which renders the structure inadequate, or to the decline of business which renders it too large for the development of the art which makes desirable the substitution of other methods of equipment and structures.

"Physical depreciation is the result of deterioration due to age and wear. It results from use, decay and the action of the elements. Physical depreciation is a constant factor. It begins as soon as the structure is exposed to the action of the elements or is put into use.

"Functional depreciation is fortuitous. It may come into play during the lifetime of a particular structure and it may not." (R. 5565)

He was asked to elaborate on the meaning of functional depreciation, and answered: "Well, that is a depreciation which is due to the lack of a structure to function. It may be either too expensive or too great for the purposes it was originally intended or not extensive enough. In other words they don't function properly". To illustrate, he stated: "Well, we * * * have found recently due to the falling off in traffic that a number of passenger stations afford greater facilities than are necessary today. In other words there is a functional depreciation", and that he "attempted to arrive at it by the lack of business that was presented. For instance, where agents had been removed or were only on duty a part of a day or a part of a week, we tried to arrive at some figure and made a comparison with about the number of people, passengers that patronized those particular stations in the past and present, and we tried to arrive at some reasonable amount of depreciation along those lines." (R. 5549-5550)

Functional depreciation seems to be applied in isolated cases. For example, it is considered in valuing side trackage in the yards (R. 5692), but does not apply to real estate (R. 5691), or to main tracks (R. 5691), because main tracks must be kept up to a certain standard. It is not considered in the case of bridges and tunnels generally. (R. 5694)

Except in instances where functional depreciation is considered, it appears that the cost of reproduction less depreciation (physical) is the standard of value.

The New Jersey Supreme Court, in Central Railroad Company, etc., v. State Board, 49 N.J.L. 1, 5, 6, 7 A. 306, 308, made the following observations pertinent to this discussion: "But it is again objected that the State Board in estimating the value of these roads and structures, took, as the absolute standard of value, either the original cost of acquisition and construction, less wear and tear, or the cost of reproduction. The court did not agree that "so fallacious a measure of value was adopted", and continued: "* * * It is common knowledge that what a thing has cost is no infallible criterion of its market value * * *. That the board ascertained the cost of acquisition and construction is beyond doubt. It could scarcely perform its functions intelligently without doing so; for such cost, though not an incontestable evidence of exchangeable value, is, nevertheless, almost always an important particular in the mass of circumstances laying the basis of a rational judgment touching the value of anything as an article of sale".

In Turnley v. Elizabeth, 76 N.J.L. 42, 68 A. 1094, the question was whether the prosecutor's property had been properly assessed according to the statutory criterion, i. e., the price the property "would sell for at a fair and bona fide sale by a private contract". The court held in the following language: "In respect to the valuation upon improvements we think that the statutory criterion has not been observed in that cost; i. e., either the original cost of construction or the estimated cost of reproduction has been regarded rather than the standard set up by the statute, viz., selling value. Under the peculiar facts of the present case the difference between

such cost and such value is of more than usual importance, for the reason that the prosecutor has incorporated into the construction of his residence a number of features and fancies that, while adding greatly to its cost, have added little or nothing to its selling price or market value." 76 N.J. L. 42, 43, 44, 68 A. 1094.

The Supreme Court of the United States has likewise committed itself on this problem in the cases of Southern Ry. Co. v. Kentucky, 274 U.S. 76, 81, 47 S.Ct. 542, 71 L.Ed. 934, and Atlanta B. & C. R. Co v. United States, 296 U.S. 33, 39, 56 S.Ct. 12, 15, 80 L.Ed. 25. In the former case the Court stated [274 U.S. 76, 47 S.Ct. 544, 71 L.Ed. 934]: "The value of the physical elements of a railroad—whether that value be deemed actual cost, cost of reproduction new, cost of reproduction, less depreciation or some other figure—is not the sole measure of or guide to its value in operation. Smyth v. Ames, 169 U.S. 466, 547, 18 S.Ct. 418, 42 L.Ed. 819." And in the latter case the Court approved the following language of the Interstate Commerce Commission: " 'Clearly, the only pertinent value is that for purposes of sale or exchange. Cost of reproduction is to be given little, if any, weight in determining such value in the absence of evidence that a reasonably prudent man would purchase or undertake the construction of the properties at such a figure.' "

It thus appears that in so far as the values of any of the properties herein involved are based upon cost of reproduction less depreciation solely such values must be condemned.

*Valuation of Franchise*

The method by which the value of the franchise has been determined has gone through three periods in the history of the tax act under consideration. Between 1898 and 1911 the following method was used. The value of the stocks and bonds was ascertained and from that value was deducted the value of the tangible property. Sixty per cent of the difference was called the franchise value. During this period, however, the franchise value was not separately listed, but was added to the main stem valuation. (R. 5588 et seq.)

After 1911 another formula was developed for the purpose of determining the value of the franchise. The system earnings were allotted to the State of New Jersey on the basis of all track miles. The reproduction cost of the property was determined and an annuity of 5½ per cent. per annum was allowed on such cost. To this annuity was added an amount intended to cover the taxes for the year. The sum of the annuity and the taxes was deducted from the allocated earnings, and the difference was called the franchise value. The franchise was listed separately beginning with this period. This method was nominally in existence between 1913 and 1930. Soon after it came into use Mr. Focht observed a "lot of irregularities" and that "there was one year * * * when the Central Railroad of New Jersey had * * * $27,000,000 worth of franchises. If we had applied that that would have ruined the road." During this period the franchise value was actually figured more or less through agreement with the companies. (R. 5598 et seq.)

About 1931 a new method was evolved. According to this formula the net railway system income is computed and a 5 per cent. deduction on the outstanding bonds is made. This sum is divided by all the track miles. The sum representing the earnings per track mile operated in New Jersey is adjusted, or more specifically, is considered in connection with sums determined in a similar fashion with reference to other railroads operating within New Jersey. This adjusted sum is then multiplied by the number of track miles of a particular railroad in New Jersey and the total is called the franchise value. Mr. Focht stated that adjustments were made with the different railroad companies on this basis. If the rule should produce nothing Mr. Focht would fall back on his judgment. (R. 5605 et seq.)

In the case of Long Dock Co. v. State Board, etc., 78 N.J.L. 44, 50, 73 A. 53, 56 (affirmed 79 N.J.L. 604, 80 A. 1135), the court made the following comments which will describe the nature of the franchise:

"* * * [The franchise] is 'remaining property,' i. e., property that is left after something has been taken or subtracted from something else. This remainder being the value of the intangible property * * * it is obvious that the subtrahend, or sum to be subtracted is the value of such tangible property, * * * and that the minuend, or sum from which such subtraction is to be made, is the total value of such corporate property * * *. Unless this is the purpose of these sections, it is impossible to see what they are doing in a statute so scientifically drawn as this one is.

"* * * the remainder obtained by the deduction of the value of the tangible property from the total value of all the corporate property gives the commercial value of the franchise expressed in the terms of money * * * as 'the remaining property' ".

In Central R. Co. v. State Board of Assessors, 49 N.J.L. 1, 7 A. 306, the court had under consideration two methods by which the value of franchises were computed. Under the first method the value of the stocks and funded debt was ascertained, and in cases where this sum exceeded the value of the tangible property of such corporation, the value of the franchise was ascertained by deducting from the aggregate amount of the value of such corporate stock and of the securities representing the debts, the value of the tangible property, and sixty per cent of the difference was denominated the franchise value. The court made the following comments:

"* * * It seems to us unquestionable that the marketable value of a successful railroad is generally greatly in excess of the value of its road-bed, equipments, and other tangible possessions. The location of the road, the places or territories it connects, its capabilities for future expansion, are all elements going to make up its productiveness as a vendible thing in the market. It would be unreasonable to affirm that a road connecting two hamlets would, under usual conditions, bring as much, if sold, as a road connecting two large cities, the cost or abstract value of the two being equal. This additional value of the road, imparted to it by reason of its location, etc., will be called, for the sake of brevity, its adventitious value.

"* * * It is plain that the subtrahend obtained by this process represents what had been above styled the adventitious value of the entire road, its chartered privileges included. It was 60 per cent. of the sum thus found that the board, calling it the value of the franchise, added to the sum of the valuations made by it, in manner already mentioned, of the real and tangible property of the company; and it was thus, by the addition of the abstract value and of the adventitious value of the road, that its entire value was found. * * *

"Regarding the second method devised by the board for the ascertainment of the value of these corporate privileges, and which was applied to the class of roads that may be denominated unproductive roads, we have concluded that such method was plainly fallacious, and must accordingly be disapproved of by us. It will be perceived * * * that, in all cases where the amount of the value of the capital stock, and of the securities representing the debts, was less than the entire amount of the estimated value of the tangible property of the corporation, the board ascertained the amount of the gross earnings of the company, and took 20 per cent. of such earnings as the value of the franchise. *But we have been utterly unable to find, under the conditions stated, any value to such franchises, other than the expense of their acquisition under the general railroad law of the state.* The property of these companies was estimated on the basis of its being railroad property; that is, that it was adapted to such uses, and would be so applied. In these instances, unlike the class just disposed of, the market value of the stock does not indicate the presence of any other factor adding a value in the entire road in excess of the estimation thus made. Under these circumstances, is it not certain that a purchaser of the road would not give for it anything more than the value of the real and personal property, and the cost of acquiring the franchise in the statutory mode? For in these cases the road has no adventitious value,—at least none such is apparent in the price of the stock.

"Our conclusion, consequently, on this branch of the case, is that the valuations of the franchises made in this latter method, and on the basis of gross earnings, must be discarded, *and in lieu thereof a merely nominal sum must be substituted.*" 49 N.J.L. 1, 8, 9, 10, 7 A. 306, 309. (Italics supplied.)

Since this case the taxing authorities have changed their method of determining franchise value, i. e., it no longer uses the stock and bond values in arriving at system value, but uses the system net earnings. In the case of Southern R. Co. v. Kentucky, 274 U.S. 76, 47 S.Ct. 542, 71 L.Ed. 934, the Court was concerned with a franchise tax upon the plaintiff railroad. The State of Kentucky had determined this tax substantially as follows: The system net income was capitalized and from that sum was deducted the value of tangible property located without the State of Kentucky. The difference was allocated to Kentucky on a mileage basis. The difference between this sum and the value of

the tangible property within Kentucky was deemed the franchise value. The railroad had been a losing venture in so far as Kentucky was concerned for the past several years. A very cogent statement relative to franchise values can be found in the following pronouncement of the Court in this case: "* * * No intangible element of substantial amount over and above the value of its physical parts inheres in a railroad that cannot earn a reasonable rate of return on its bare bones—as the mere tangible elements properly may be called. See Omaha v. Omaha Water Co., 218 U.S. 180, 202, 30 S.Ct. 615, 54 L. Ed. 991, 48 L.R.A.,N.S., 1084." 274 U.S. 76, 82, 47 S.Ct. 542, 544, 71 L.Ed. 934.

The value of the franchise, therefore, *must reflect the earnings* of the property. This takes us to a place where we may appropriately discuss the influence of earnings in general before finding a conclusion as to the legality of the New Jersey method of evaluating the franchises.

*Earnings as Reflected in Value*

Plaintiffs' most strenuous contention against the assessments is that they do not reflect the earnings of the various railroads. Plaintiffs anticipate the defense that the aggregate valuations for the years in question are lower than those of the "boom" period by stating that this reduction in valuation was due to (a) retirement of equipment and discontinuance of certain facilities (See R. 5689), and (b) physical deterioration due to lack of maintenance (See R. 5582, 5688, 5693, 5564) of the facilities retained in operation. Plaintiffs complain that there was no change in real estate values during this period except such as were required by some local non-railroad condition (See R. 5701), and that there was no reduction in the value of structural items. Mr. Focht testified (R. 5702) that there could not be any reduction in value of structural items, because they had to be maintained in first class condition for purposes of safety.

The record, however, indicates through the testimony of Mr. Focht that the land values which constitute 20 to 25 per cent. of the total assessments in dispute were not increased during the "boom" period. Defendants contend that the assessments reflect the earnings of the railroad, and rely specifically upon the cases wherein the so-called functional depreciation is applied. Mr. Focht testified (R. 5701 et seq.) that a reduction of $52,000,000 was made in these properties due to the depression. But from this testimony it seems that such a reduction reflected lack of maintenance and deterioration. He again reiterated that there could be no reduction in such structures as bridges and tunnels. The record certainly does not disclose that there has been any horizontal reduction in values attributable absolutely to the decline in earnings.

The most recent judicial observation pertinent to this problem is the case of Great Northern R. Co. v. Weeks, 297 U.S. 135, 56 S.Ct. 426, 80 L.Ed. 532:

"The long period through which, even in 1933, the depression had extended compelled the conclusion that it was not temporary. Judicial notice must be taken of the fact that late in 1929 there occurred a great collapse of values of all classes of property—railroads, other utilities, commodities, and securities, and that the depression then commenced progressively became greater. *In making assessments in that period, the board was bound to take into account and give due weight to the sudden, progressive, and enormous declines of value.*

* * *

"* * * It clearly appears tnat the board failed to give reasonable weight to the falling off of petitioner's traffic, gross earnings, operating income, the extraordinary shrinkage in values of railroad properties, the prices of commodities, and securities generally. The value of petitioner's property varied with the profitableness of its use, present and prospective. Cleveland, C., C. & St. L. Ry. Co. v. Backus, 154 U.S. 439, 445, 14 S.Ct. 1122, 38 L.Ed. 1041; Southern Ry. Co. v. Kentucky, 274 U.S. 76, 81, 82, 47 S.Ct. 542, 71 L.Ed. 934." 297 U.S. 135, 149, 151, 56 S.Ct. 426, 433, 80 L.Ed. 532. (Underscoring supplied).

The following language in the case of Cleveland &c. Ry. Co. v. Backus, 154 U.S. 439, 14 S.Ct. 1122, 1124, 38 L.Ed. 1041, overcomes any possible defense to the effect that this is a property tax and not an income tax: "The rule of property taxation is that the value of the property is the basis of taxation. It does not mean a tax upon the earnings which the property makes, nor for the privilege of using the property, but rests solely upon the value. But the value of property results from the use to which it is put, and varies with the profitableness of that use, present and

prospective, actual and anticipated. There is no pecuniary value outside of that which results from such use. The amount and profitable character of such use determines the value, and, if property is taxed at its actual cash value, it is taxed upon something which is created by the uses to which it is put." The Court made this convincing illustration: "* * * Suppose there be two bridges over the Ohio, the cost of the construction of each being the same,—one between Cincinnati and Newport, and another 20 miles below, and where there is nothing but a small village on either shore. The value of the one will, manifestly, be greater than that of the other, and that excess of value will spring solely from the larger use of the one than of the other." 154 U.S. 439, 445, 446, 14 S.Ct. 1122, 1124, 38 L.Ed. 1041.

And in the case of Cincinnati Southern Ry. Co. v. Guenther, C.C., 19 F. 395, 400, we find another apposite illustration: "* * * A railroad that costs $20,000 per mile is worth as much as one that costs $50,000 per mile, if its business and net earnings be as great or greater. Indeed, it is more valuable, in one sense, as it makes a better return on the investment."

These references are sufficient to convince the court that it is mandatory upon the taxing authorities to make the assessments unequivocally evince and reflect the earnings of the railroads. This does not mean that if there are no earnings there will be nothing to assess, but it does mean that the assessments should *evidence the influence of earnings or lack thereof.*

The decrease in earnings of these properties is not temporary, but has been due to a permanent loss of traffic as a result of changes in business and transportation methods. It must be remembered that these railroads were built to provide transportation before the perfection of the motor-truck and the construction of the highway system. A large percentage of the traffic formerly carried solely by the railroads is now being transported by trucks, busses, etc. The rapid development of concrete state highways has resulted in the diversion to truck haulage of a vast tonnage of freight, including anthracite coal. Coal shipments have also declined because of the growing use of petroleum for fuel, which does not move by rail to any extent. The court is further moved to take notice of the loss of export traffic. Foreign nations have increased ttheir custom duties on American products in reprisal for the increase in the tariff on imported goods with the result that their trade has gone elsewhere. In order to reflect this deflation and diversion of business it is imperative that the earnings should permeate every item of railroad property, tangible, and intangible.

To illustrate the disregard of earnings by the taxing authorities let us turn again to a consideration of the tables set forth above.

The Lehigh Valley Railroad in 1928 (Tax year) earned $17,996,581 and its New Jersey property was valued at $41,294,624. In the 1936 (Tax year) the *system* earned only $7,344,997, but the New Jersey assessments were increased to $43,286,018.

The Delaware, Lackawanna & Western Railroad *system* earned $26,960,047 in 1928 (Tax year) and its New Jersey property was valued at $76,526,743. For the year 1936 (Tax year) the *system* earned only $8,797,150 but the New Jersey assessment was reduced only to $74,920,184.

The New York Central Railroad *system* earned $154,572,106 in 1928 (Tax year), and its New Jersey properties were valued at $26,665,844. In 1936 (Tax year) the *system* earned only $53,997,909, but the New Jersey assessment was only reduced to $25,987,941.

The Central Railroad of New Jersey in 1931 (Tax year) earned $14,467,442 and its New Jersey properties were valued at $104,837,338. In 1936 (Tax year) the *system* earned $8,065,980 and the assessment was reduced to $87,291,161.

The Erie Railroad *system* earned $24,027,989 in 1931 (Tax year) and its New Jersey properties were assessed at $48,507,412. In 1936 (Tax year) the earnings fell to $15,895,187, but the New Jersey assessment was decreased only to $45,938,958.

The New York, Susquehanna and Western Railroad Co. earned $1,014,180 in 1931 (Tax year) and its New Jersey property was valued at $9,383,374. In 1936 (Tax year) the earnings decreased to $639,790 but the assessment was decreased only to $8,069,317.

The New Jersey & New York R. R. in 1927 (Tax year) earned $1,626,065 and its New Jersey properties were assessed at $886,194. In 1936 (Tax year) the *system* earned only $828,269 but the value of its property within New Jersey was increased to $1,290,552.

The New York & Long Branch R. R. *system* earned in 1928 (Tax year) $2,047,-374 and its New Jersey property was valued at $4,955,555. In 1936 (Tax year) the earnings dropped to $709,429, but the assessment was only decreased to $4,863,714.

It will be observed that in the cases of the Lehigh Valley Railroad, and the New Jersey and New York Railroad that the assessments for 1936 (Tax year) are higher notwithstanding decreased earnings than they were in the year that the companies' earnings were greatest. In the cases of the other roads the assessments declined. This decline is obviously fortuitous and not reflective of the diminished earnings.

In New Jersey we are constrained to the opinion that the assessors do not consider the rise and fall of earnings in fixing their valuations. It is their duty to reflect these earnings in the assessments, and it cannot possibly present a burdensome difficulty to them in view of the fact that the assessments are not completed until approximately two years after the year in question. The earnings in such case are a result of mathematical calculation.

In the case of the franchises the cases to which we have alluded indicate that no more than a nominal value can be assessed where there are no earnings. We conclude that the tax authorities of New Jersey have erred in their method of assessing franchise values. We do not overlook the fact that there are instances where the franchises have been assessed at $1,-000 which perhaps is a nominal value, but the taxing authorities did not come to this conclusion by way of the legal channels which we have set forth above, but rather by the extra legal processes such as the naked "judgment" of the taxing authority.

*Comment on Prior Decisions of this Court in Railroad Tax Litigation*

Anticipatory of any query relative to the court's failure to condemn the method of taxation in New Jersey in the 1932 cases, it should be noted that it was there emphatically pointed out that nothing in that decision should be construed as a justification or an approval of the methods of the taxing authorities. Lehigh Valley R. Co. of New Jersey v. Martin, D.C., 19 F. Supp. 63, 82. Furthermore, since that time the board's failure to give weight to the earnings of the railroads and its continued persistence in basing its assessments upon the principles herein condemned has extended beyond the field of casual disregard of duty, and now manifests itself as a permanent abuse of rights, which should no longer be countenanced.

*On the Question of Discrimination*

The question of discrimination against the railroads was considered by this court in Lehigh Valley R. Co. of N. J. v. Martin, 19 F.Supp. 63, 68-70. We there indicated that relief against discrimination would be granted when property other than railroad property was intentionally and systematically undervalued, but held that no competent evidence of such was presented. The court took cognizance of the fact that the legislature of New Jersey had established means to equalize the assessment ratio in the subdivisions of the state, and that even the reports of the taxing authorities indicated an inequality of assessment. Notwithstanding this, the court concluded that no more than a cloud of suspicion was cast upon the assessments within New Jersey from which no evidence of intentional and systematic discrimination could be concluded. No justification to alter this conclusion appears in the present case because the testimony herein is of the same quality. The additional testimony is merely cumulative and consequently of no greater weight than that in Lehigh Valley R. Co. v. Martin, supra.

*Comment on Motions to Dismiss*

Defendants have prayed for dismissal of the suits brought by the New York, Susquehanna & Western Railroad which presently is in a reorganization proceeding (Case Nos. 5206, 5497 and 5690) in this court, the New Jersey and New York Railroad (Case Nos. 5199, 5494 and 5691), the New York and Long Branch Railroad Company (Case Nos. 5203, 5496 and 5694) and the Reading Company (Case No. 5200). This motion is apparently made due to the quantum of testimony offered by these plaintiffs. In the case of the Reading Company the motion is granted. No evidence has been tendered by this party, nor have their rights been asserted in the briefs of counsel. The court is constrained to the conclusion that this party has abandoned the proceeding.

In the case of the other railroads the motion is denied, because there is no indication of abandonment. It must be re-

membered that these cases were consolidated with other cases and are entitled to the benefit of evidence adduced in those cases. This is especially true in view of the fact that Mr. Focht made general observations relative to the principles upon which the state's method of taxation is based. These principles were not confined to any specific railroad but were applied to all railroads. In spite of the fact that the testimony offered by these plaintiffs is meagre, they are entitled to a correction of these general abuses.

Earlier in this discussion we referred to the case of Worcester County Trust Co. v. Riley supra, which prohibits a suit against a state unless there is a violation of constitutional rights. Under the case of Great Northern R. Co v. Weeks, supra, the disregard of earnings constituted a denial of rights under the due process clause of the Fourteenth Amendment, U.S.C.A.Const. The Court stated: "The board's failure to consider the enormous diminution in value of petitioner's property caused by the 1929 collapse and the progress of the depression is, within the principles of our decisions, the equivalent in law of intention to make a grossly excessive assessment for 1933 in disregard of petitioner's rights under the due process clause of the Fourteenth Amendment. We need not consider whether the assessment is repugnant to the equal protection or commerce clause. Unquestionably, the assessment was made in plain violation of established principles that govern property valuation. Fargo v. Hart, 193 U.S. 490, 502, 24 S.Ct. 498, 48 L.Ed. 761; Rowley v. Chicago & N. W. Ry., supra, 293 U.S. 102, 109, 110, 55 S.Ct. 55, 79 L.Ed. 222; State of Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Comm., 262 U.S. 276, 287, 288, 43 S.Ct. 544, 67 L.Ed. 981, 31 A.L.R. 807; Bluefield Waterworks Co. v. Public Service Comm. 262 U.S. 679, 692, 43 S.Ct. 675, 67 L.Ed. 1176; McCardle v. Indianapolis Water Co., 272 U.S. 400, 408-412, 47 S.Ct. 144, 71 L.Ed. 316; Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463." 297 U.S. 135, 152, 56 S.Ct. 426, 434, 80 L.Ed. 532. This conclusion disposes of the contention that the suit cannot be maintained against the State of New Jersey, and distinguishes this case from the case of Worcester County Trust Co. v. Riley, supra, because there is a constitutional infringement involved here.

The court is unprepared to state to what extent the assessments are excessive, nor does it think it has power so to do.

The prayers of the plaintiffs for injunctions to restrain the collection of taxes will be granted until such time as the taxing authorities of New Jersey revalue the property in accordance with the views herein expressed.

The preparation of this memorandum was concluded in July of 1938. It was not filed because representatives of both sides to the litigation conceded the possibility that the New Jersey Legislature might intervene in such a manner as to make a judicial determination unnecessary. It is now apparent that such action is unlikely, and to withhold the filing of the memorandum is presently felt to be without advantage to the litigants.